900 A.2d 787

JOSEPH POTENTE, PLAINTIFF–RESPONDENT, v. COUNTY OF HUDSON, DEFENDANT–APPELLANT, AND CARMEN MESSA-NO, INDIVIDUALLY AND IN HIS CAPACITY AS PROSECUTOR FOR HUDSON COUNTY; ROBERT B. MARTIN, INDIVIDUAL-LY AND IN HIS CAPACITY AS CHIEF OF INVESTIGATIONS FOR THE OFFICE OF THE HUDSON COUNTY PROSECUTOR, DEFENDANTS.

Argued March 6, 2006—Decided June 6, 2006.

*Ralph J. Lamparello* argued the cause for appellant (*Chasan Leyner & Lamparello,* attorneys; *Cindy Nan Vogelman,* of counsel; *John L. Shahdanian II,* on the brief).

*Bruce D. Leder* argued the cause for respondent (*Cohen, Leder, Montalbano & Grossman,* attorneys).

Justice LONG delivered the opinion of the Court.

In 1994, plaintiff, Joseph Potente, after undergoing shoulder surgery, was terminated from his position at the Hudson County Prosecutor's Office for excessive absence without permission. Plaintiff filed a complaint in federal court against the County of Hudson, the Hudson County Prosecutor, and his supervisor. After plaintiff's federal claim was dismissed and pendant jurisdiction was denied, plaintiff filed a Law Against Discrimination (LAD) complaint, *N.J.S.A.* 10:5-1 to −49, in state court against the County of Hudson. The trial judge granted a directed verdict on liability in plaintiff's favor and a jury returned an award of damages. In addition, the trial judge awarded pre- and post-judgment interest and counsel fees.

We have been asked to determine whether a directed verdict on the subject of failure to accommodate was properly entered and whether pre-judgment interest is a remedy cognizable under the LAD. The Appellate Division answered those questions affirmatively. Although we agree that pre-judgment interest is available under the LAD and affirm the Appellate Division's judgment in that respect, because we have concluded that the directed verdict was improvidently granted, we now reverse and remand the matter for a new trial.

I

Plaintiff was hired by the Hudson County Prosecutor's Office as an investigator in 1982 and served continuously in that position until December 1993, when, on duty, he was injured in an automobile accident.

Plaintiff received a worker's compensation award during his recovery and was eventually cleared to work six hours a day, accompanied by two hours of daily therapy. On May 4, 1994, plaintiff returned to work. Because plaintiff's neck and shoulder injuries rendered him unable to qualify to use a weapon, he was assigned to the radio room for three weeks, where he answered phones and talked on the radio. Subsequently, plaintiff was transferred to full-time duty in the domestic violence section. That position required no field work; rather, it involved interviewing domestic violence victims at the Prosecutor's Office. Plaintiff continued to work in that section until September 20, 1994, when he took sick leave to undergo shoulder surgery.

Plaintiff expected his recovery to last six to eight weeks. Despite the fact that the injury was work related, plaintiff did not seek to reopen his worker's compensation case; rather, he used his accrued compensatory and sick time to obtain pay during the recovery period.[1] On November 10, 1994, plaintiff's sick and

---

[1] The parties' collective bargaining agreement allowed medical leave at the "Prosecutor's sole discretion." Before being eligible for such leave, plaintiff was required to use all accrued sick and vacation leave.

vacation time ran out and he thereafter applied for state disability benefits. Plaintiff also testified that throughout his recovery, he requested positions involving light duty and was repeatedly told that the Prosecutor's Office did not have such positions. To his knowledge, he could "only come back at 100 percent or not all."

On November 22, 1994, plaintiff sent a memorandum to James Hoppes, his direct supervisor, requesting a leave of absence due to the shoulder surgery and continuing therapy. On November 23, Hoppes wrote back to plaintiff, stating that a "more detailed account of your injuries and subsequent treatment" must be provided by November 28. In response, on November 28, plaintiff sent a memorandum to Hoppes and Robert Martin, his ultimate supervisor, explaining his injury and suggesting that his treating physician could be contacted for further clarification.

On November 29, 1994, Hoppes hand-delivered a letter from Martin to plaintiff, denying plaintiff's request for leave because it was "unspecified." The letter instructed plaintiff to report to work on November 30 and stated that "[f]ailure to comply with this directive will result in disciplinary action." Upon receipt of the letter on November 29, plaintiff contacted several individuals to inquire about the letter. Those individuals included Hoppes; Kevin Wilder, plaintiff's union president; and John Bigger, an investigator involved with the union.

It is here that the parties' versions of the events diverge. The County of Hudson asserts that Bigger contacted Martin on November 29 to arrange a meeting on November 30. According to Bigger, the purpose of that meeting was to "get [plaintiff] in there and we'll sit down and see what kind of accommodations we can reach here ... and that may include going after another leave of absence." Bigger told Martin that "[w]e'll walk [plaintiff] through it." Martin stated that Bigger's suggestion was "reasonable," and agreed to attend the meeting, but emphasized that plaintiff had to report to work on November 30.

Bigger then telephoned plaintiff and explained his conversation with Martin. Wilder also informed plaintiff about the meeting. Bigger told plaintiff that

> [y]ou're going to have to come in and we're going to try to work out some accommodations here because your days have run out and at least you can get a pay check out of this deal. You know, come in and we'll find something or if there's going to be a point where you can't—you know, if it's something that you can't do anything maybe, we'll try to work to get another leave of absence, you know, we'll try another, you know, a route there.

According to the County of Hudson, the meeting was to have covered the following topics: (1) potential accommodations, including a leave of absence; (2) plaintiff's medical condition; (3) making arrangements so that plaintiff could "fill out the paperwork in the handbook to apply appropriately for unpaid leave of absence"; (4) the fact that plaintiff had exhausted all of his vacation and sick time; (5) the fact that plaintiff's earlier requests for leave were not specific; and (6) how to classify plaintiff.

Additionally, on November 29, Bigger spoke to the union's labor attorney, who recommended that plaintiff return to work. Bigger then relayed that recommendation to plaintiff by telephone. Plaintiff responded that he was unable to operate the stick shift in his car and could not afford a taxi or bus. Bigger offered to drive plaintiff to work, and plaintiff agreed. Bigger then informed Wilder and Martin that the meeting was on for the following morning. Around 11:00 p.m. that evening, however, plaintiff called Bigger and informed him that he was not going to come in for the meeting because his own counsel had advised him that coming in would "mess up his disability case."

According to the County of Hudson, Bigger called plaintiff on the morning of the meeting to tell him that it was not too late to come in. Plaintiff repeated that his counsel had advised him not to do so. Plaintiff also spoke to Hoppes by telephone that day and said that he was going to take sick time. According to Hoppes, when he informed plaintiff that his sick time had run out, plaintiff said that he understood that he was absent without authorization.

Plaintiff's version of the facts regarding the November 30 meeting is substantially different. He denies that any meeting was ever discussed, let alone scheduled. In support of his position, plaintiff notes that at Martin's deposition, Martin did not mention the meeting in response to a question asking about the importance of the November 30 deadline. In addition, plaintiff points to the absence of documentary evidence about the meeting.

At some point on November 30, instead of reporting to work, plaintiff faxed a letter to the County of Hudson requesting family leave until December 15, 1994. In a response dated November 30, Martin informed plaintiff that he did not qualify under the Federal Family and Medical Leave Act or the New Jersey Family Leave Act. Plaintiff testified that although the letter reiterated the requirement that he report to work on November 30, he did not receive it until December 1.

Following the November 30 deadline, there appears to have been no communication between plaintiff and the County of Hudson until December 7. On December 7, Hoppes hand-delivered a letter to plaintiff, informing him that he had been terminated because he was "absent without leave or permission from November 18, 1994."

In December 1996, plaintiff filed a complaint in federal court against the County of Hudson, the Hudson County Prosecutor, and Martin. The complaint alleged causes of action under 42 *U.S.C.* § 1983 and state law, including claims under the LAD. The federal district court dismissed plaintiff's federal claims on the merits and refused to exercise pendent jurisdiction over plaintiff's remaining state law claims. In December 1999, plaintiff filed a LAD complaint in state court.

The case was eventually tried in January and February 2003. Plaintiff withdrew his claim against the Hudson County Prosecutor and the claim against Martin was ultimately dismissed. Thus, the sole remaining defendant was the County of Hudson (defendant). At the conclusion of defendant's case, the trial judge considered cross-motions for a directed verdict and granted plain-

tiff's motion with respect to liability based on failure to accommodate. The case was then submitted to the jury for a determination of damages. The jury awarded plaintiff $200,000 in back pay and $50,000 in pain and suffering. The trial judge also granted plaintiff attorney's fees, as well as pre- and post-judgment interest. Pre-judgment interest totaled $67,340.26. Defendant appealed, and the Appellate Division affirmed the trial judge's grant of a directed verdict and the award of pre-judgment interest. We granted certification. 185 *N.J.* 297, 884 *A.*2d 1267 (2005).

## II

Defendant argues that factual disputes precluded the grant of a directed verdict and that, in any event, pre-judgment interest is not a cognizable remedy under the LAD. Plaintiff counters that there were no material factual issues regarding liability that required jury resolution and that pre-judgment interest is a LAD remedy.

## III

We turn first to the directed verdict. The LAD prohibits employment discrimination on the basis of a disability. *N.J.S.A.* 10:5–4.1, –29.1. At the heart of this case is plaintiff's contention that defendant failed to provide a reasonable accommodation for his disability. "The LAD does not specifically address reasonable accommodation, but our courts have uniformly held that the law nevertheless requires an employer to reasonably accommodate an employee's handicap." *Tynan v. Vicinage 13 of the Superior Court of N.J.,* 351 *N.J.Super.* 385, 396, 798 *A.*2d 648 (App.Div. 2002). Administrative regulations set out the specific requirements of the reasonable accommodation process mandated by the LAD. In brief, unless it would impose an undue hardship on the operation of the business, *N.J.A.C.* 13:13–2.5(b) requires an employer to make a "reasonable accommodation to the limitations of an employee ... who is a person with a disability." However, an employer is not required to take action "where it can reasonably

be determined that an . . . employee, as a result of the individual's disability, cannot perform the essential function of the job even with reasonable accommodation." *N.J.A.C.* 13:13–2.8(a).

In this case, plaintiff claims that defendant failed to offer an accommodation for his disability. Defendant counters that it tried to meet with plaintiff to arrange an accommodation but that he refused to participate. Apparently resolving that factual dispute in plaintiff's favor, the trial judge granted a directed verdict for plaintiff.

A directed verdict is governed by the following standard: [I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom reasonable minds could differ, the motion must be denied. . . .

[*Monaco v. Hartz Mt. Corp.*, 178 *N.J.* 401, 413, 840 *A.*2d 822 (2004) (citations omitted).]

Applying that standard, the directed verdict was improvidently granted because reasonable minds could differ regarding whether defendant was willing to accommodate plaintiff. To be sure, plaintiff testified that no accommodation was offered, no meeting was scheduled, and it was conveyed that he must return to work at "100 percent or not at all." However, there was also evidence from Martin, Hoppes, Wilder, and Bigger that the defendant wanted to accommodate plaintiff, that there was an agreement to discuss accommodations, and that a meeting for that purpose was scheduled to take place on November 30, 1994. When plaintiff resisted, he was encouraged by defendant's representatives to participate in the meeting so that an agreement could be forged, to no avail. Plainly, an employee cannot refuse to cooperate with an employer's efforts to accommodate his disability and then claim failure to accommodate. *See Beck v. Univ. of Wis. Bd. of Regents*, 75 *F.*3d 1130, 1135–36 (7th Cir.1996). Thus, it was for the jury to determine whose version of the facts was correct; whether a November 30 meeting was scheduled; whether defendant was willing to discuss accommodating plaintiff at the November 30 meeting; and, if so, the circumstances under which plaintiff did

not attend. As such, a directed liability verdict on the issue of accommodation was unwarranted and a new trial must take place.

## IV

In light of our disposition, we need not address the question of whether the Appellate Division correctly concluded that pre-judgment interest is permitted under the LAD. Nevertheless, we choose to do so in order to guide the parties on retrial. In 1990, the Legislature amended the LAD, adding the following language:

> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies.... *Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.*
>
> [*N.J.S.A.* 10:5-3 (emphasis added).]

Additionally, the LAD provides that "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs." *N.J.S.A.* 10:5-13. Accordingly, if pre-judgment interest was an available remedy in common law tort actions when the 1990 LAD amendments were enacted, then that remedy is cognizable under the LAD. We find that it was.

Prior to 1972, the request to recover pre-judgment interest was limited to cases in which the claim was liquidated—that is, a known and exact sum of money was owed.

> Where a claim was unliquidated, it was felt that it would be unjust to charge the defendant with interest, since it was impossible for him to calculate the exact sum owing in order to pay that amount and stop the running of interest.
>
> [Marilyn Minzer et al., 5 *Damages in Tort Actions* § 39.01[1] (Bender 1991) (citations omitted).]

In 1972, this Court adopted *Rule* 4:42–11(b), which allows pre-judgment interest in tort actions:

> (b) Tort Actions. Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort

actions, including products liability actions, include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later....

In *Busik v. Levine*, 63 *N.J.* 351, 307 *A.*2d 571 (1973), we detailed our motivation in adopting the rule:

The fact remains that ... the defendant has had the use, and the plaintiff has not, of moneys which the judgment finds was the damage plaintiff suffered. This is true whether the contested liability is for a liquidated or for an unliquidated sum....

....

... [P]re-judgment interest will hopefully induce prompt defense consideration of settlement possibilities. In that meaningful way, pre-judgment interest bears directly upon the judicial machinery and the problems of judicial management. It is this facet, added to the consideration of justice between the litigants, which warrants our holding that pre-judgment interest be payable in these matters. [*Id.* at 359–60, 307 *A.*2d 571 (citations omitted).]

In sum, prior to the 1972 adoption of *Rule* 4:42–11(b), the availability of pre-judgment interest in a common law tort action was dependent on the liquidity of the claim. With the enactment of the rule, that distinction became irrelevant and pre-judgment interest became an available remedy in common law tort actions. Accordingly, when the LAD was amended to allow "[a]ll remedies available in common law tort actions," *N.J.S.A.* 10:5–13, pre-judgment interest was an available remedy under the LAD. *See Gallo v. Salesian Soc'y, Inc.*, 290 *N.J.Super.* 616, 661–62, 676 *A.*2d 580 (App.Div.1996) (allowing pre-judgment interest under the LAD); *Milazzo v. Exxon Corp.*, 243 *N.J.Super.* 573, 576, 580 *A.*2d 1107 (Law Div.1990) (same); *see also Abrams v. Lightolier, Inc.*, 841 *F.Supp.* 584, 599 (D.N.J.1994) (applying New Jersey law and allowing pre-judgment interest under the LAD), *rev'd in part on other grounds*, 50 *F.*3d 1204 (3d Cir.1995); *McKenna v. Pacific Rail Serv.*, 817 *F.Supp.* 498, 518 (D.N.J.1993) (same), *vacated and remanded on other grounds*, 32 *F.*3d 820 (3d Cir.1994).

Defendant does not disagree with the proposition that pre-judgment interest is generally available in a LAD case, but argues that it may not be assessed against a public entity. For that proposition, defendant cites *Hurley v. Atlantic City Police Dep't*,

where pre-judgment interest was denied in a case involving a compensatory award against a public employer under the LAD. 174 *F*.3d 95, 130 (3d Cir.1999). In ruling, the *Hurley* court relied on *Coleman v. Kaye*, 87 *F*.3d 1491 (3d Cir.1996), which stated:

> Nor can pre-judgment interest be assessed against the County of Monmouth. The court rule that Coleman invokes expressly provides that pre-judgment interest will not be awarded against a public entity "[e]xcept where provided by statute...." *N.J. Ct. R.* 4:42–11(b). There is no statutory authorization in New Jersey for such an award. To the contrary, as the New Jersey Appellate Division stated in *Maynard v. Mine Hill Township*, 244 *N.J.Super.* 298, 582 *A*.2d 315 (App.Div.1990), the New Jersey Tort Claims Act "specifically prohibits pre-judgment interest against government tortfeasors."
>
> [*Coleman, supra*, 87 *F*.3d at 1511–12 (citing *N.J.S.A.* 59:9–2(a)).]

*Coleman* and *Hurley* misread *Rule* 4:42–11(b). We return to the language of the Rule:

> (b) Tort Actions. *Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law,* the court *shall,* in tort actions ... include in the judgment [pre-judgment interest]....
>
> [*R.* 4:42–11(b) (emphasis added).]

 The notion expressed in *Hurley* and *Coleman* that "pre-judgment interest will *not* be awarded against a public entity 'except where provided by statute,' " is simply wrong. What the rule actually says is that pre-judgment interest *shall* be awarded against all defendants *unless* it is prohibited by applicable law. For example, the Tort Claims Act (TCA) states, in relevant part, that "[n]o interest shall accrue prior to the entry of judgment against a public entity or public employee." *N.J.S.A.* 59:9–2(a). Therefore, TCA claims are not subject to *Rule* 4:42–11(b). *See Dorn v. Transp. of N.J.*, 200 *N.J.Super.* 159, 164, 491 *A*.2d 1 (App.Div.1984); *Maynard, supra*, 244 *N.J.Super.* at 303, 582 *A*.2d 315. A similar provision excluding pre-judgment interest, however, does not exist under the LAD. Thus, there is no bar to a pre-judgment interest award under that statute.

 Defendant suggests that the bar against pre-judgment interest in the TCA should be imported into the LAD. But LAD claims are not subject to the strictures of the TCA. *See Fuchilla v. Layman*, 109 *N.J.* 319, 335, 537 *A*.2d 652 (1988) (stating, "the

Legislature did not intend that the [TCA] apply to discrimination claims under the [LAD]"). Indeed, this Court has allowed LAD plaintiffs to recover punitive damages against public entities, despite the TCA's bar on such awards. *Cavuoti v. N.J. Transit Corp.*, 161 *N.J.* 107, 133, 735 *A.*2d 548 (1999). Therefore, because the LAD does not itself prohibit the award of pre-judgment interest against public entities, and the TCA's bar on pre-judgment interest does not apply to LAD claims, if plaintiff is successful on retrial, he will be entitled to that remedy.

## V

The judgment of the Appellate Division affirming the grant of a directed verdict on liability is reversed and the matter is remanded for a new trial to be held in accordance with the principles to which we have adverted.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.