923 A.2d 315

NEW JERSEY MANUFACTURERS INSURANCE COMPANY, PLAINTIFF–RESPONDENT, v. NATIONAL CASUALTY COMPANY, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued January 10, 2007—Decided June 4, 2007.

Before Judges WINKELSTEIN, FUENTES and BAXTER.

*Allan Maitlin* argued the cause for appellant (*Sachs, Maitlin, Fleming & Greene,* attorneys; *Mr. Maitlin,* of counsel and on the brief; *Christopher Klabonski,* on the brief).

*Loren L. Pierce* argued the cause for respondent (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys; *Ms. Pierce,* of counsel; *Lisbeth W. Cload,* on the brief).

The opinion of the court was delivered by

FUENTES, J.A.D.

This appeal requires us to determine whether plaintiff, New Jersey Manufacturers Insurance Company ("NJM"), the issuer of a primary insurance policy, is obligated to pay prejudgment interest pursuant to *R.* 4:42–11(b), where such payment would exceed its coverage limit. We consider this question in the context of an agreement in which NJM and National Casualty Company ("NCC"), the issuer of an excess policy, agreed to settle a claim against their insured, leaving the question of prejudgment interest to be determined by the Law Division.

In granting NJM's motion for summary judgment, the Law Division determined that NJM was responsible only up to its policy limit of $1 million. All sums in excess of this coverage limit, including prejudgment interest, were the responsibility of NCC as the excess carrier. NCC now appeals from this judgment.

█ After a careful review of the record, we reverse and remand for the trial court to conduct an evidentiary hearing. Applying the standards articulated by the Supreme Court in *Kotzian v. Barr*, 81 *N.J.* 360, 367, 408 *A.*2d 131 (1979), we cannot determine from this record whether NJM violated its fiduciary duty to engage in meaningful, timely, good faith efforts to settle the claims asserted by the party suing its insured within the policy's coverage limit.

█ In order to determine if a carrier is liable for the payment of prejudgment interest, even if such payment exceeds its policy's coverage limit, a trial court must find sufficient evidence showing that the carrier did not engage in good faith negotiations to settle the claim within the policy's coverage limit. In going about this task, the court should consider (1) whether the carrier made timely settlement offers that were reflective of the strength of the claimants' case, as to both liability and damages; (2) whether the carrier's negotiation strategy had a reasonable prospect for a successful outcome; and (3) whether the carrier offered its policy limit of coverage in a timely fashion, after becoming aware that the case would not settle for an amount within the policy's limit.

I

The coverage issues raised here relate to the defense of the defendant, Grinnell Haulers Inc., in *Brodsky v. Grinnell Haulers, Inc.*, 362 *N.J.Super.* 256, 827 *A.*2d 1104 (App.Div.2003), *rev'd on other grounds,* 181 *N.J.* 102, 853 *A.*2d 940 (2004), a personal injury/wrongful death action brought by the Brodskys in 1999 against Grinnell Haulers and John Bennett. Mr. Brodsky was

killed in the accident. Although Mrs. Brodsky survived, she was seriously injured. Grinnell Haulers had a primary insurance policy with NJM, and an excess umbrella policy with NCC. After considerable litigation, including Supreme Court review resulting in a second trial, the Brodsky plaintiffs prevailed in this action, obtaining a $1,640,000 judgment against Grinnell Haulers, exclusive of prejudgment interest. *Brodsky, supra,* 181 *N.J.* at 128, 853 *A.*2d 940.

Here, the NJM policy had a coverage limit of $1 million. The excess policy issued by NCC provided $4 million in additional coverage. After considerable litigation, NJM eventually paid its $1 million policy limit; NCC paid an additional $640,000. NJM and NCC disagreed, however, over which carrier was ultimately responsible for the prejudgment interest. The carriers finally agreed to split the prejudgment interest, reserving the right to have the court determine their respective obligations for interest under the terms of the policies.

NCC argues that NJM is responsible for all prejudgment interest, or in the alternative, that NCC is only responsible for its pro rata share of the prejudgment interest. NCC also maintains that NJM acted in bad faith against its own insured, by: (1) arguing that the interest be construed as "prejudgment," as opposed to "post-judgment;" and (2) failing to tender its $1 million policy limit for settlement purposes prior to the first trial. Lastly, NCC asserts that the Brodsky accident consisted of five separate and individual losses. As a result, NJM's policy limit was not exhausted, because the policy provides $1 million coverage for each loss.

We agree in part with the arguments raised by NCC. Under the circumstances presented here, the trial court must determine whether NJM's failure to timely offer its policy limit amounted to bad faith, rendering it liable for the payment of all prejudgment interest. In this light, we need not, and specifically do not reach any of the other arguments advanced by NCC in support of this appeal.

## II

In order to assess the reasonableness of NJM's conduct during the settlement negotiations, we must first describe the facts of the underlying automobile accident case. First, as noted by the Supreme Court, the only issue submitted to the jury during the first trial was the extent of the plaintiff's damages and the apportionment of fault between defendants. *Brodsky, supra,* 181 *N.J.* at 107, 853 *A.*2d 940. With respect to damages, we gave the following description of the injuries the Brodskys sustained in the accident:

At the time of the accident Bernard Brodsky was sixty-nine years old and Gloria Brodsky was sixty-three. They were married for forty-three years and had three grown children. After being struck by Horsman, Gloria was thrown into the air and against the concrete road divider, landing on the roadway on her back. According to her orthopedic surgeon, Dr. David Jeffrey Greifinger, Gloria suffered: (1) open fractures of her right forearm, with attendant nerve damage, requiring surgery; (2) a herniated disk (with some disk degeneration pre-existing the accident), which impinged on nerves in her back, resulting in pain running from her lower back down to her calf and ankle; (3) five fractured ribs; (4) an injury to her right hip, which was either arthritis or avascular necrosis (death of part of the bone, as a result of lost blood supply); (5) a bruised liver; and (6) fluid in her lungs, indicating she suffered chest trauma.

Greifinger opined that, for the rest of her life, Gloria would experience periodic aches and pains from the injuries to her forearm, back, ribs, and hip. The nerves in her forearm, and her liver and lungs had healed completely. These findings were consistent with Gloria's complaints of continued pain and heaviness in her right arm, shooting pain in her lower back and legs, a dull pain in her ribs, and problems with her hip when she walks.

Defendants' medical expert, Dr. Francis DeLuca, an orthopedic surgeon, opined that the damage to Gloria's hip and back was degenerative, and unrelated to the accident. He noted that Gloria had not sought treatment for her back and hip until more than one year after the accident.

With respect to her claim of negligent infliction of emotional distress, Gloria stated that she observed Bernard being struck by Horsman's vehicle. She had a vivid memory of seeing Bernard's feet, in white socks, at the accident scene, and repeatedly yelling for him to wiggle his toes, so she would know he was alive. She learned of his death while she was in the hospital; she regretted being unable to attend his funeral, to say goodbye, due to her injuries.

In terms of her psychiatric injuries, Gloria stated that, after the accident, she felt lonely, depressed, and guilty for having survived the accident when Bernard had not. She began seeing a psychiatrist, and he prescribed various psychiatric medicines. Gloria believed these medications helped. However, she no longer had

the full and happy life she once did. She avoided social situations, saw her children less often, had trouble sleeping, had recurrent dreams of her husband's white socks at the accident scene, and thoughts of the accident intruded on her thoughts during the day. Gloria's daughter, Dawn, noticed changes in Gloria's personality after the accident. Dawn stated that Gloria became fearful, irritable, and bitter; she did not participate in social activities, tired easily, cried often, and found no joy in things that used to bring her pleasure.

Dr. Ronnie Seltzer, plaintiffs' psychiatrist, opined that, as a result of the accident, Gloria suffered from post-traumatic stress disorder, major depressive disorder, and chronic pain syndrome. Seltzer opined that, despite therapy and medications, Gloria continued to experience psychiatric symptoms. He believed these symptoms would continue indefinitely, though they would fluctuate over time.

Defendants' psychiatrist, Dr. David Gallina, opined that immediately after the accident Gloria suffered from major depression. However, by May 10, 2001, when he evaluated her, Gloria suffered from only mild to moderate anxiety and depression, similar to that for which she had been treated prior to the accident. Gallina attributed only approximately fifty percent of Gloria's anxiety and depression to the accident. Gallina also opined that Gloria did not suffer from post-traumatic stress disorder.

[*Id.*]

In October 1999, the plaintiffs in *Brodsky* demanded $5,000,000 to settle the case against Grinnell Hauler. In September 2000, the Brodskys' counsel wrote to Grinnell Haulers' counsel, Donald S. McCord, reducing plaintiffs' settlement demand to $3,500,000. In July 2001, Brodsky's counsel sent another letter to McCord reiterating the settlement demand of $3.5 million, and advising McCord that "this case will never settle for $1 million or less, but will only settle, if ever, well into the excess policy." The Brodskys' counsel stated that "[t]he failure of [NJM] to tender its full policy and place [the Brodskys] in a position to negotiate directly with the Scottsdale Insurance Company [1] is exposing Scottsdale Insurance Company to substantial liability."

According to McCord's certification submitted in support of NJM's motion for summary judgment, "[i]n anticipation of the first trial in 2001, [the] case was conferenced before Judge Zucker–Zarrett in November. After that conference, [McCord] was authorized to extend a settlement offer to [the Brodskys] of

---

[1] Scottsdale Insurance Company issued a general commercial liability policy to Grinnell Haulers.

$400,000, to 'get the ball rolling.' [The Brodsky's] demand remained at $3.5 million." On November 13, 2001, McCord wrote to NJM and NCC that the Brodskys' counsel maintained there was no point in having any settlement discussions until NJM offered the $1 million dollar policy limit. According to McCord, there was never a reduction from the $3.5 million demand before or during the first trial.

The first trial was scheduled to take place November 26, 2001. Prior to the start of the trial, McCord offered the Brodskys $750,000 to settle the case. The Brodsky's counsel rejected the settlement offer. In December 2001, the Brodskys obtained a verdict in their favor in the amount of $1,640,000, plus prejudgment interest, for a total judgment of $1,945,533.17. The jury award was apportioned as follows: $50,000 to the estate on the survivorship action and $295,000 to the estate on the wrongful death claim; to Mrs. Brodsky: $350,000 for physical injuries; $750,000 for emotional distress in witnessing the accident; $100,000 for psychiatric injuries as a result of the accident, other than witnessing it; $95,000 for lost earnings. *Brodsky, supra,* 362 *N.J.Super.* at 278–79, 827 *A.*2d 1104.

Grinnell Haulers appealed, and moved for a stay and approval of the supersedes bond, which was granted in an order dated May 10, 2002. The Brodskys cross-appealed. We decided the appeal on July 21, 2003. *Id.* at 256, 827 *A.*2d 1104. On appeal from our decision, the Supreme Court affirmed in part, reversed in part, and remanded the matter to the trial court in a decision dated August 10, 2004. *Brodsky, supra,* 181 *N.J.* 102, 853 *A.*2d 940.

Thereafter, McCord, as Grinnell Haulers' counsel, moved to vacate the prior order of judgment. In September 2004, prior to the second trial, the trial court ordered the parties to appear for mediation. McCord advised NCC's counsel, Allan Maitlin, that NJM had authorized its $1 million policy limit toward payment of any settlement or judgment. According to McCord, he spoke with Maitlin on several occasions prior to the mediation. According to McCord, Maitlin did not want the Brodskys' counsel to be told

that NJM had authorized the $1 million, in an effort to convince the Brodskys to settle for less.

Although the Brodskys initially demanded $2.3 million to settle, they ultimately agreed to accept $1.5 million. According to McCord, NCC, for the first time, offered to contribute $100,000 toward settlement, insisting that NJM put up the remaining $400,000, thereby meeting the $1.5 million settlement demand. NJM declined, arguing that it was not bound to pay anything that exceeded the limits of the primary policy.

In his certification, McCord claimed that it was clear to him that prior to the second trial, the Brodsky plaintiffs would have settled for $1.5 million, a demand that could have been met, had NCC agreed to contribute the additional $400,000.

All parties agreed that the amount due for prejudgment interest was $580,322.07. NJM and NCC executed an agreement through which each paid one half of this figure, reserving their right to appeal.

### III

The NJM policy issued to Grinnell Haulers provided coverage "for all sums that insured legally must pay as damages because of bodily injury or property damage ... caused by an accident and resulting from the ownership, maintenance, or use of a covered auto." Accident is defined to include "continuous or repeated exposure to the same conditions resulting in bodily injury or property damage." The policy further provided that "regardless of the number of covered autos, insureds, premiums paid, claims made or vehicles involved in the accident, the most [NJM] will pay for the total of all damages ... resulting from any one accident is the limit of insurance for liability coverage shown in the declarations." The declarations page limited coverage to $1 million.

The umbrella policy issued by NCC provides up to $4 million in excess of the primary insurance coverage. It requires NCC to pay "on behalf of the 'insured' those sums in excess of the

'retained limit' which the 'insured' becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury' arising out of an 'occurrence' during the policy period."

Occurrence is defined to include:

(1) An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage" that is not expected or not intended by the "insured."

All damages that arise from continuous or repeated exposure to substantially the same general conditions are considered to arise from one "occurrence."

(2) An offense that results in "personal injury."

All damages that arise from exposure to the same act, publication or general conditions are considered to arise from one "occurrence."

The policy defines "Retained Limit" as follows: "With respect to any 'occurrence' that is covered by *'underlying insurance'* or any other insurance, the total of the applicable limits of the 'underlying insurance' plus the applicable limits of any other insurance[.]" (Emphasis added). "Underlying insurance" means

the policies listed in Schedule A—Schedule of Underlying Insurance and any other policies purchased or issued for any newly acquired or formed organization not more restrictive than the terms, conditions, endorsements, and limits of liability of the policies listed in Schedule A and to be maintained by you in accordance with Condition M of this policy.

Schedule A states the underlying insurance policy as NJM's auto insurance policy providing for bodily injury and property damage coverage in the amount of $1 million. Condition M of the NCC policy provides in relevant part:

(1) That the 'underlying insurance' shall remain in force during the 'Policy Period;'

(2) That the terms, conditions and endorsements of the 'underlying insurance' will not materially change; and

(3) That the limits of liability as warranted by Schedule A will not change, except for reduction or exhaustion in the aggregate or 'occurrence' limits due to payments for 'occurrences' during the 'Policy Period.'

Condition G, within the NCC policy, provides that NCC "will have liability for any one 'occurrence' only when the amount of the 'retained limit' with respect to such 'occurrence' has been paid by: (a) The 'insured'; (b) [NCC] on behalf of the 'insured' (other than

under this policy), or (c) the 'insured's' underlying insurer." The occurrence limit for NCC's policy is $4,000,000.

## IV

The Law Division reviewed and decided these issues in the context of a summary judgment motion. We thus review the motion judge's decision using the same legal standard. We first decide whether there was a genuine issue of fact. Absent a genuine and material factual dispute, we decide if the motion judge's ruling on the law was correct. *Prudential Prop. & Cas. Ins. v. Boylan,* 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div.), *certif. denied,* 154 *N.J.* 608, 713 *A.*2d 499 (1998); *see* Pressler, *Current N.J. Court Rules,* comment on *R.* 2:10–2 (2007).

NCC argues that the motion judge erred in holding it liable for the prejudgment interest because: (1) NJM controlled the litigation from its beginning to its conclusion; (2) forced the insured to go to trial without attempting to settle the case within its policy limits; and (3) retained use of the $1 million over the course of the litigation. Thus, according to NCC, NJM cannot avoid responsibility for the interest awarded, even if such an amount is in excess of its policy limits.

NCC further argues that had there been no excess coverage, NJM would have been obligated to pay the entire prejudgment interest, even though it would have exceeded its coverage limit. Thus, NJM cannot control the litigation to a conclusion, force a trial without tendering its policy limits to foster settlement, and then attempt to foist the excess liability upon the insured.

Finally, NCC argues that, as the primary carrier, NJM owes a duty of good faith and fair dealing to its insured to conclude the matter within the policy limits, if warranted under the circumstances. NCC argues that because NJM did not take the initiative to seek out the Brodsky plaintiffs and attempt to conclude the matter by tendering the $1 million policy, NJM should be obligated to pay the interest on the award of $1,640,000.

In *Kotzian, supra*, the plaintiff was seriously injured in an automobile accident. 81 *N.J.* at 361, 408 *A.*2d 131. The defendant had a liability policy providing a maximum coverage of $15,000, a sum considered wholly inadequate in light of the severity of the plaintiff's injury, and "the virtually incontestible negligence" of the defendant. *Ibid.* There was no excess policy, and the defendant was judgment-proof. *Ibid.* Early in the litigation, the defendant's carrier offered the plaintiffs the policy limit of $15,000, without any interest, "in full settlement of [the defendant's] liability." *Ibid.* The plaintiffs rejected this offer, and offered instead to accept the $15,000 policy limit, "plus prejudgment interest on the fair value of the claim, calculated by them to be $100,000." *Ibid.*

Pursuant to *R.* 4:57–1, the carrier obtained an order permitting it to deposit the policy's limit of $15,000 with the trial court. *Ibid.* This order also included a provision that the $15,000 represented the "full extent of the obligation of that insurer including any obligation of the insurer to pay prejudgment interest." *Ibid.* The order further provided that, "regardless of who is obligated to pay same," all prejudgment interest would be "tolled as of the date of the offering of said policy limits to the plaintiff in settlement of this claim." *Id.* at 362, 408 *A.*2d 131. The case was tried to conclusion, resulting in a jury verdict in plaintiffs' favor in the amount of $100,000. *Ibid.*

Against these facts, the Supreme Court held in *Kotzian* that the insurance carrier was not legally obligated to pay anything above the policy's coverage limit, including prejudgment interest. The Court reached this conclusion to avoid penalizing the carrier "for offering no more than the full amount it had contracted to pay." *Id.* at 367, 408 *A.*2d 131. The Court further noted:

Were policy limits not involved, we would have little difficulty in concluding that prejudgment interest should be assessed in this case. Surely, as the [appellate panel] pointed out, [the carrier] could have immediately deposited the policy limits into court, as it eventually did. *See R.* 4:57. However, we are not prepared to say that [the carrier's] failure to have made earlier deposit of its full policy limits, having sought early in the proceedings to make the money available to plaintiffs by its offer, should result in the company's being required to pay over and above the

amount contracted for with its assured. *This is not to say that the insurance contract is so sacrosanct that misconduct or bad faith on the part of the carrier would protect it against a claim for prejudgment interest over its policy limits;* but that is not the case here and indeed at oral argument plaintiffs' attorney expressly eschewed any such claim. Under all the circumstances we detect no mistaken exercise of the trial court's discretion in disallowing prejudgment interest.

[*Ibid.* (emphasis added).]

Thus, under *Kotzian,* a carrier may be found liable for prejudgment interest under *R.* 4:42–11(b), even if such payment exceeds the policy's coverage limit, if the manner it has handled a claim against its insured evidences "misconduct" or "bad faith." This duty of good faith is a well-established part of our State's insurance law. *See Rova Farms Resort, Inc., v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 489–90, 323 *A.*2d 495 (1974); *Bowers v. Camden Fire Ins. Ass'n.,* 51 *N.J.* 62, 71–72, 237 *A.*2d 857 (1968); *Radio Taxi Serv., Inc. v. Lincoln Mut. Ins. Co.,* 31 *N.J.* 299, 304, 157 *A.*2d 319 (1960).

The purpose of insurance is to protect the insured from liability within the limits of the policy's coverage. In exchange for this protection, the insured gives up the right to control the litigation. As noted by the Court in *Rova Farms:*

[A]n insurer, having contractually restricted the independent negotiating power of its insured, has a positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage. Any doubt as to the existence of an opportunity to settle within the face amount of the coverage or as to the ability and willingness of the insured to pay any excess required for settlement must be resolved in favor of the insured unless the insurer, by some affirmative evidence, demonstrates there was not only no realistic possibility of settlement within policy limits, but also that the insured would not have contributed to whatever settlement figure above that sum might have been available.

[*Rova Farms, supra,* 65 *N.J.* at 496, 323 *A.*2d 495.]

Stated differently, an insurance carrier owes a duty to its insured to aggressively pursue all available avenues to settle a claim within the policy's coverage limit. This requires the carrier to investigate, in a timely and thorough fashion, the facts surrounding the claim, in order to be in the best position to assess the strengths and weaknesses of the claimant's case.

■■■ Armed with this information, the carrier must thereafter engage in good faith discussions with the claimant, with the goal of settling the claim within the policy's coverage limits. Where warranted, the carrier is required to offer the full amount of the policy's coverage. Failure to do so renders the carrier liable for claims that exceed the policy's coverage limit.

Here, the record shows that throughout the entire process including the pretrial discovery period, the first trial, and Appellate Division and subsequent Supreme Court review, NJM's settlement posture remained significantly unchanged, even though: (1) liability was not contested; and (2) the plaintiff never wavered from her position that, due to the severity of the injuries, the case would not settle for less than NJM's $1 million-dollar coverage limit. Given the severe, permanent injuries suffered by the claimant, and the incontestable liability of the tortfeasor, we cannot say that claimant's settlement position was facially unreasonable.

■■■ The public policy underpinning the authority of the court to award prejudgment interest under *R.* 4:42–11(b) is well-settled. An award of prejudgment interest is not punitive. Rather, prejudgment interest acknowledges that plaintiff has been denied the use of the money, while defendant has not. It also serves to promote the early settlement of cases. *Potente v. County of Hudson,* 187 *N.J.* 103, 113, 900 *A.2d* 787 (2006) (citing *Busik v. Levine,* 63 *N.J.* 351, 359–60, 307 *A.2d* 571, *appeal dismissed,* 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.2d* 733 (1973)).

■■■ Here, NJM retained the use of the policy's $1 million while the case proceeded through the various adjudicatory levels. Confronted by these facts, the trial court must determine whether NJM's adoption of this "hardball" settlement strategy amounted to a violation of its fiduciary duty under both *Kotzian* and *Rova Farms,* thus rendering it liable for the prejudgment interest accrued. The existence of excess coverage does not in any way extinguish or diminish a primary carrier's fiduciary duty to its

insured to take all reasonable steps to settle a case within the scope of the primary coverage, including offering the policy limit.

Once the primary carrier offers the policy limit, the excess carrier has a fiduciary duty to shield the insured from further liability, by contributing (within the scope of the excess coverage), the funds necessary to reach a final settlement. As is the case with the primary carrier, the excess carrier must act with reasonable dispatch in order to avoid incurring the same liability imposed on the primary carrier. Here, NCC fulfilled this duty by contributing, in a timely fashion, $640,000 beyond NJM's $1 million, resulting in a total final settlement of $1,640,000.

## V

The judgment of the trial court is reversed. The matter is remanded for the court to determine whether NJM is liable to pay all of the prejudgment interest owed the claimant under *R.* 4:42–11(b).

Reversed and remanded. We do not retain jurisdiction.