992 A.2d 837 (2010)
413 N.J. Super. 94
NEW JERSEY MANUFACTURERS INSURANCE COMPANY, Plaintiff-Respondent,
v.
NATIONAL CASUALTY COMPANY, Defendant-Appellant.
No. A-0737-09T3
Superior Court of New Jersey, Appellate Division.
Argued March 23, 2010.
Decided April 29, 2010.
*838 Allan Maitlin, West Orange, argued the cause for appellant (Sachs, Maitlin, Fleming & Greene, attorneys; Mr. Maitlin, of counsel and on the briefs; Christopher Klabonski, on the briefs).
Loren L. Pierce, Morristown, argued the cause for respondent (McElroy, Deutsch, Mulvaney & Carpenter, attorneys; Ms. Pierce, of counsel; Lisbeth W. Cload, on the brief).
Before Judges SKILLMAN, FUENTES and GILROY.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
This appeal requires us to consider the circumstances under which a primary insurer may be held liable to an excess insurer for prejudgment interest awarded to the plaintiff in an underlying tort action based on the primary insurer's alleged failure to engage in good faith settlement negotiations.
In the early morning hours of February 16, 1998, an employee of Grinnell Haulers sideswiped a vehicle occupied by Bernard and Gloria Brodsky, causing it to come to a rest on a shoulder of the highway facing oncoming traffic. Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 106, 853 A.2d 940 (2004). The Brodskys exited their car and stood on the shoulder. Minutes later, a vehicle driven by William Horsman hit Mr. Brodsky and then the disabled car, which struck Mrs. Brodsky. Id. at 106-07, 853 A.2d 940. Mr. Brodsky died soon after, and Mrs. Brodsky suffered severe permanent injuries. Id. at 107, 853 A.2d 940.
The Brodskys filed a personal injury and wrongful death action against Grinnell and Horsman. Ibid. Horsman, who was not insured, filed for bankruptcy, and the bankruptcy court discharged Horsman from any debt arising from the accident. Ibid.
Grinnell had a primary insurance policy with plaintiff New Jersey Manufacturers Insurance Company (NJM), with a coverage limit of $1 million, and an excess policy with defendant National Casualty Company (NCC), which provided an additional $4 million in coverage.
In October 1999, the Brodskys made a settlement demand of $5 million against Grinnell, which was lowered to $3.5 million in September 2000. This demand remained firm in the face of offers by Grinnell for $400,000 and $750,000 before the first trial in December 2001.
At that trial, the only issues were the apportionment of fault between Grinnell and Horsman and the extent of the Brodskys' damages. Brodsky, supra, 181 N.J. at 107, 853 A.2d 940. The jury found Grinnell sixty percent negligent and Horsman *839 forty percent negligent, and awarded the Brodskys $1,640,000 in damages, plus prejudgment interest, for a total judgment of $1,945,533.17. Ibid.
On appeal, we concluded that the trial court erred in giving an ultimate outcome instruction and therefore reversed and remanded for a new trial on the apportionment of liability. Brodsky v. Grinnell Haulers, Inc., 362 N.J.Super. 256, 262, 284, 827 A.2d 1104 (App.Div.2003). The Supreme Court affirmed this decision. Brodsky, supra, 181 N.J. at 128, 853 A.2d 940.
Before the trial on remand, Grinnell's counsel informed NCC's counsel in September 2004 that NJM had authorized payment of its full $1 million policy limit to settle the Brodskys' claims. However, NCC's counsel allegedly asked Grinnell's counsel to withhold this offer from the Brodskys' counsel in order to convince the Brodskys to settle for less than $1 million.
Around the same time, the Brodskys lowered their settlement demand to $1.5 million. However, NCC allegedly offered to contribute only $100,000 to meet this demand, insisting that NJM pay the remaining $1.4 million. NJM refused to pay this amount, taking the position that it was not obligated to pay anything above its $1 million policy limit to settle the case. The communications between NCC and NJM regarding the Brodskys' $1.5 million settlement demand are discussed in greater detail later in this opinion.
In December 2004, the trial on remand took place, which resulted in the same apportionment of liability as the first trial: Grinnell was again found sixty percent negligent and Horsman was again found forty percent negligent. Thus, a judgment in the amount of $1,640,000 was entered against Grinnell, plus $580,322.07 of prejudgment interest.
NJM paid its $1 million policy limit and NCC paid the remaining $640,000 of the damages award. The carriers agreed to equally divide responsibility for payment of the $580,322.07 in prejudgment interest on a temporary basis, reserving the right to litigate their obligation for payment of this obligation.
NJM subsequently brought this action seeking a determination that NCC is obligated to pay the full amount of the prejudgment interest awarded to the Brodskys. NCC filed a counterclaim seeking a determination that NJM is responsible for payment of the prejudgment interest. The trial court decided the case on NJM's motion for summary judgment, determining that NJM was only responsible for its $1 million policy limit and that NCC was responsible for the entire judgment above this amount, including $580,322.07 in prejudgment interest awarded the Brodskys.
On appeal, we reversed this summary judgment. N.J. Mfrs. Ins. Co. v. Nat'l Cas. Co., 393 N.J.Super. 340, 923 A.2d 315 (App.Div.), certif. denied, 192 N.J. 481, 932 A.2d 31 (2007). We concluded that a primary carrier such as NJM may be held "liable for the payment of prejudgment interest, even if such payment exceeds its policy's coverage limit, [if the] trial court... find[s] ... that the carrier did not engage in good faith negotiations to settle the claim within the policy's coverage limit." Id. at 344, 923 A.2d 315. In reaching this conclusion, we stated:
[A] carrier may be found liable for prejudgment interest under R. 4:42-11(b), even if such payment exceeds the policy's coverage limit, if the manner it has handled a claim against its insured evidences "misconduct" or "bad faith." This duty of good faith is a well-established part of our State's insurance law.
....

*840 ... The existence of excess coverage does not in any way extinguish or diminish a primary carrier's fiduciary duty to its insured to take all reasonable steps to settle a case within the scope of the primary coverage, including offering the policy limit.
[Id. at 353-55, 923 A.2d 315 (citations omitted).]
We also concluded that it could not be determined based on the evidentiary material presented to the trial court on NJM's motion for summary judgment "whether NJM violated its fiduciary duty to engage in meaningful, timely, good faith efforts to settle the claims asserted by the party suing its insured within the policy's coverage limit." Id. at 344, 923 A.2d 315. Accordingly, we remanded for an evidentiary hearing.
On the remand, NJM undertook to obtain discovery regarding NCC's own course of conduct in the negotiations for settlement of the Brodskys' claims, focusing particularly on the period following NJM's decision to offer its $1 million policy limit to settle the case. NCC resisted such discovery on the ground that only NJM's conduct was relevant to NJM's obligation to pay the entire amount of prejudgment interest.
NJM served a subpoena on NCC's counsel, Allan Maitlin, requesting his deposition and production of his file regarding his representation of NCC during the Brodsky litigation. NJM also sought to depose James Lavigne, NCC's Senior Litigation Specialist who monitored the Brodsky litigation for NCC.
NCC moved to quash the subpoena served on Maitlin and for a protective order barring Lavigne's deposition. NJM filed a cross-motion for an order compelling NCC to produce a detailed privilege log. NCC also filed a motion to strike NJM's fourth and fifth affirmative defenses to its counterclaim, which asserted that NCC had denied the coverage it owed to Grinnell and NJM in bad faith and breached its fiduciary duties to Grinnell and NJM.
The trial court denied NCC's motions to quash Maitlin's subpoena and for a protective order as to the discovery related to Lavigne and granted NJM's motion for production of a privilege log. The court also denied NCC's motion to strike NJM's fourth and fifth affirmative defenses to its counterclaim.
NCC filed a motion for leave to appeal these orders, which we denied. NCC then filed a motion for leave to appeal with the Supreme Court, which granted the motion and "summarily remanded to the Appellate Division to consider on the merits."

I.
The primary issue presented by this appeal is whether NCC's conduct relating to the negotiations for settlement of the Brodskys' claims is relevant to NCC's claim against NJM for the entire amount of prejudgment interest awarded the Brodskys. We did not decide this issue in NCC's prior appeal because the only issue before us was whether the trial court had properly granted NJM summary judgment denying NCC's claim without conducting an evidentiary hearing on the question of whether NJM violated its fiduciary duty to engage in meaningful, timely, good faith efforts to settle the Brodskys' claims. 393 N.J.Super. at 344, 923 A.2d 315.
In determining the relevance of NCC's conduct relating to the negotiations for settlement of the Brodskys' claims, we start with Rova Farms Resort, Inc. v. Investors Insurance Co. of America, 65 N.J. 474, 323 A.2d 495 (1974), which is the seminal case dealing with an insurer's obligation to engage in good faith negotiations *841 with a party asserting a claim against its insured, in default of which the insurer may become liable for the full amount of a judgment against its insured even though it exceeds the policy's coverage limit. In Rova Farms, the Court held:
An insurer, having contractually restricted the independent negotiating power of its insured, has a positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage. Any doubt as to the existence of an opportunity to settle within the face amount of the coverage or as to the ability and willingness of the insured to pay any excess required for settlement must be resolved in favor of the insured unless the insurer, by some affirmative evidence, demonstrates there was not only no realistic possibility of settlement within policy limits, but also that the insured would not have contributed to whatever settlement figure above that sum might have been available.

[Id. at 496, 323 A.2d 495 (emphasis added).]
Thus, under Rova Farms, an insurer that fails to negotiate in good faith with a party who asserts a claim against its insured is not automatically liable for any judgment in excess of the policy limit. Instead, the insurer may avoid such liability if it can show that there was no realistic possibility of a settlement within the policy limits and that its insuredor in this case the excess carrierwould not have contributed whatever amount above the policy limit would have been required to settle the case.
In Courvoisier v. Harley Davidson of Trenton, Inc., 162 N.J. 153, 164, 742 A.2d 542 (1999), the Court reaffirmed the availability of this affirmative defense to an insurer against which a Rova Farms claim is asserted:
Under Rova Farms, it is the insured's burden to "establish bad faith on the part of the insurer" in a separate trial. Once the insured establishes such bad faith,
a prima facie case of damages for the difference between the policy limit and the excess verdict has also been shown. It is then up to the insurer to demonstrate that settlement could not have been achieved within the policy limit or for the policy limit plus any amount the insured would have been able and willing to contribute.

[Emphasis added; citations omitted.]
Therefore, NJM is entitled to conduct appropriate discovery to support this defense to liability.
Moreover, even without whatever additional evidence may be revealed by the discovery authorized by the orders that are the subject of this appeal, there is already evidence in the record that could support such a defense. Before the first trial in 2001, the Brodskys' counsel made a settlement demand of $3.5 million, and advised Grinnell's counsel that "this case will never settle for $1 million or less, but will only settle, if ever, well into the excess policy." A trier of fact could find based on this evidence that "there was ... no realistic possibility of settlement [of the Brodskys' claims before the first trial] within [the $1 million NJM] policy limits[.]" Rova Farms, supra, 65 N.J. at 496, 323 A.2d 495. In addition, although there is no direct evidence whether NCC expressed a willingness to contribute to a settlement before the first trial, the record contains a document entitled "[NCC] Reinsurance Claim Status Report," dated July 1, 2002, which states in part:
After further consideration, we have advised the underlying carrier [NJM] that they are not to expect indemnification of the Insured from our *842 policy, unless it will require more than $2,000,000 to settle the claim.[1]
Thus, this document indicates that NCC was unwilling to contribute to a settlement of the Brodskys' claim unless NJM first agreed to contribute $2 million. There is no evidence that NCC changed this settlement position prior to September 2004.
We also note that the July 1, 2002 report refers to a previous report, dated December 21, 2001, which would have been around the time of the first trial. This document is not part of the record before us, but presumably would be discoverable under the orders that are the subject of this appeal and may indicate whether NCC expressed any willingness to contribute to a settlement before or immediately after the first trial.
Although our discussion thus far has focused upon the relevance of NCC's conduct with respect to its claim for prejudgment interest based on NJM's alleged bad faith in the settlement negotiations preceding the first trial, NCC's conduct with respect to the settlement negotiations preceding the second trial is also relevant. On September 3, 2004, NJM authorized the payment of its full $1 million policy limit towards the settlement of the Brodskys' claims, which was confirmed by a letter from Grinnell's counsel, dated September 9, 2004. However, NCC's counsel allegedly requested Grinnell's counsel to withhold disclosure of this authorization from the Brodskys' counsel in the hope that the case could still be settled for less than NJM's policy limit. Furthermore, when the Brodskys' counsel made a settlement demand of $1.5 million, NCC only offered to contribute $100,000 towards such a settlement, taking the position that NJM should contribute the remaining $1.4 million, which was $400,000 above its $1 million policy limit.
These allegations, if established at trial, could justify a conclusion that even if NJM acted in bad faith in failing to offer its policy limits to settle the Brodskys' claims before the first trial, and NJM failed to establish the previously discussed affirmative defense to NCC's claim, thus subjecting NJM to liability for prejudgment interest for the period after the case could have been settled by an offer of NJM's policy limits before the first trial, such liability should terminate as of September 2004, when NJM offered its policy limits but NCC refused to contribute more than $100,000 to a settlement. 1 Allan D. Windt, Insurance Claims and Disputes: Representation of Insurance Companies and Insureds § 5.26 (5th ed. 2007) (stating that "[w]hen a primary insurer ... is willing to contribute its limit of liability to a settlement and makes that fact known to an excess insurer, ... the excess insurer should be subject to the same duty to settle principles as a primary insurer"). Therefore, NCC's settlement position before the second trial is also relevant, and NJM is entitled to conduct discovery to obtain additional evidence regarding that position.

II.
NCC argues that the discovery orders from which this interlocutory appeal has been taken violate the attorney-client privilege and the confidentiality of "mediation communications" provided by N.J.S.A. 2A:23C-1 to -13, and Rule 1:40-4(c) and (d). These arguments are clearly without merit and do not warrant extended discussion. R. 2:11-3(e)(1)(E). We only note *843 that those orders simply require NCC's counsel and "Senior Litigation Specialist" to appear for depositions, without ruling upon any specific questions of privilege that may arise during the course of those depositions, and require NCC to produce a more detailed privilege log, without ruling upon whatever privilege claims that log may present.

III.
For the guidance of the trial court, we also make several additional observations about NCC's claim against NJM.
First, we note that the Court in Rova Farms discussed the "various difficulties" presented by a claim for prejudgment interest based on an insurer's breach of its duty of good faith in settlement negotiations. 65 N.J. at 503, 323 A.2d 495. One of those difficulties is establishing the "point in time" at which "an insurer's failure to settle [may] be said to [have] occur[red]." Id. at 504, 323 A.2d 495.
The Brodskys were presumably awarded prejudgment interest from May 18, 1999, which was "the date of the institution of [their] action." R. 4:42-11(b). However, NCC's claim that NJM should be liable for prejudgment interest because it failed to engage in good faith negotiations to settle the Brodskys' claim appears to be based solely on NJM's failure to offer the full amount of its policy in settlement negotiations in the fall of 2001. Therefore, even if NCC establishes this claim, it is difficult to see how it could support imposition of liability upon NJM for prejudgment interest that accrued before it breached its fiduciary duty to its insured.
Second, NCC places substantial reliance upon the fact that NJM had use of the $1 million it paid in partial satisfaction of the judgment against Grinnell for the more than five-year period between the filing of the complaint and entry of final judgment after the second trial. However, we see no basis in Rova Farms or its progeny for the imposition of any liability upon a primary insurer beyond its policy limits without a showing of the bad faith and the failure to establish the previously discussed affirmative defense. To the contrary, Kotzian v. Barr, 81 N.J. 360, 366-67, 408 A.2d 131 (1979) indicates that imposition of liability upon a primary insurer for prejudgment interest beyond its policy limit is impermissible in the absence of a showing of bad faith. In any event, to the extent NJM's use of the $1 million provided under its policy during the entire course of this prolonged litigation may be relevant, it must be noted that NCC also had use during that same period of the $640,000 it ultimately had to pay to satisfy the judgment.
The interlocutory orders from which this appeal was taken are affirmed. The case is remanded to the trial court.
NOTES
[1] The basis for this position, explained in the July 1, 2002 status report, was that the claims on behalf of Mrs. Brodsky and the estate of Mr. Brodsky involved "two separate accidents, two separate claims and two separate losses."