SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## Mary Richter v. Oakland Board of Education (A-23-19) (083273)

**Argued September 14, 2020 -- Decided June 8, 2021**

**LaVECCHIA, J., writing for a unanimous Court.**

Plaintiff Mary Richter, a longtime type 1 diabetic and teacher, experienced a hypoglycemic event in a classroom. She sustained serious and permanent life-altering injuries. Richter pursued through this action a claim under the Law Against Discrimination (LAD), alleging that her employer failed to accommodate her pre-existing disability. The Court addresses two issues: (1) whether Richter is required to establish an adverse employment action -- such as a demotion, termination, or other similarly recognized adverse employment action -- to be able to proceed with an LAD failure-to-accommodate disability claim; and (2) whether plaintiff's claim is barred by the "exclusive remedy provision" of the Worker's Compensation Act (WCA) because she recovered workers' compensation benefits.

Richter was a science teacher employed by defendant Oakland Board of Education. At the start of the 2012-2013 school year, Richter received her schedule for the first marking period and learned that her lunch was scheduled for 1:05 p.m. Believing that would negatively affect her blood sugar levels, Richter asked defendant Gregg Desiderio, the principal of the school where she taught, to adjust her schedule so she could eat lunch during the period beginning at 11:31 a.m. Desiderio told Richter he would "look into it." Further communications were exchanged about the requested accommodation; in the end, no change was made, and Richter attended to her cafeteria duties and ingested glucose tablets to maintain her blood sugar levels. Adjustment was made during the second marking period; however, a similar scheduling issue arose during the third marking period.

On March 5, 2013, near the end the period before her lunch, Richter suffered a hypoglycemic event in front of her students. She had a seizure, lost consciousness, and struck her head on a lab table and the floor, causing extensive bleeding. Richter was transported to a hospital for treatment. Prior to that, she had never passed out at work.

Richter filed a workers' compensation claim for the work-related injuries; she recovered for her medical bills and for disability benefits. In March 2015, Richter filed this action rooted in the LAD for failure to accommodate her diabetic condition.

1

Defendants moved for partial summary judgment on the basis that Richter's bodily injury claim was barred by the exclusive remedy provision of the WCA. The motion judge held that under the WCA's intentional wrong exception, Richter's bodily injury claim was not barred. Defendants moved for summary judgment again, alleging that Richter failed to establish a prima facie failure-to-accommodate claim under the LAD because she suffered no adverse employment action. A different motion judge granted defendants' motion for summary judgment.

The Appellate Division reversed the grant of summary judgment in favor of defendants. 459 N.J. Super. 400, 412-13 (App. Div. 2019). The Court granted defendants' petition for certification, limited to "whether an employee alleging discrimination for failure to accommodate a disability, pursuant to the [LAD], is required to show an adverse employment action; and whether plaintiff's claim is barred by the exclusive remedy provision of the [WCA]." 240 N.J. 58 (2019).

**HELD:** An adverse employment action is not a required element for a failure-to-accommodate claim under the LAD. Further, plaintiff's LAD claim based on defendants' alleged failure to accommodate her pre-existing diabetic condition is not barred by the WCA, and plaintiff need not filter her claim through the required showings of the "intentional wrong exception."

1. Although the LAD does not explicitly address a reasonable accommodation requirement or claim, New Jersey courts have uniformly held that the LAD nevertheless requires an employer to reasonably accommodate an employee's disability. That requirement was codified at N.J.A.C. 13:13-2.5(b) in 1985. Under that regulation, unless it would impose an undue hardship on the operation of the business, an employer must make a reasonable accommodation to the limitations of an employee who is a person with a disability. The identification of the elements of the failure-to-accommodate claim developed in decisions issued by trial and Appellate Division courts. Those courts identified adverse employment consequence as one element of the prima facie case for disability discrimination, in part because the factual setting of each case included an adverse job consequence. (pp. 16-18)

2. In Victor v. State, the Court confronted for the first time a dispute over the required elements of a failure-to-accommodate claim where a claimant does not allege an adverse employment action. 203 N.J. 383, 412-13 (2010). The Victor Court noted that a "disabled employee who is denied a requested reasonable accommodation . . . will generally, as a result," suffer an adverse consequence, but "there may be individuals with disabilities who request reasonable accommodations, whose requests are not addressed or are denied, and who continue nonetheless to toil on." Id. at 421. The Victor Court declined to "foreclose the possibility of circumstances that would give rise to a claim for failure to accommodate even without an identifiable adverse employment consequence." Id. at 422. Ultimately, the holding in Victor did not resolve whether an adverse

2

employment action is a requisite part of a prima facie failure-to-accommodate claim because it rested on other grounds.  Id. at 422-24.  In two later cases -- Royster v. State Police, 227 N.J. 482, 500 (2017), and Caraballo v. City of Jersey City Police Department, 237 N.J. 255, 267-68 (2019) -- the Court recited the elements of a failure-to-accommodate claim without including adverse employment action as a requirement, but did not expressly hold that an adverse employment action is not an element of an LAD claim for failure to accommodate.  (pp. 18-21)

3.  Many federal courts have recited the elements of a failure to accommodate claim under the Americans with Disabilities Act without mention of a required adverse employment action, as the Court did for claims under the LAD in Royster and Caraballo.  And in at least two federal cases, a plaintiff's failure-to-accommodate claim was permitted to proceed when no adverse employment action occurred.  (pp. 21-25)

4.  The Court now formally holds that an adverse employment action is not a required element for a failure-to-accommodate claim.  The wrongful act for purposes of a failure-to-accommodate claim is the employer's failure to perform its duty, not a further adverse employment action that the employee must suffer.  To best implement the Legislature's stated intent to eradicate discrimination and make the workplace hospitable for persons with disabilities, the Court concludes that an employer's inaction, silence, or inadequate response to a reasonable accommodation request is an omission that can give rise to a cause of action.  Stated otherwise, a failure-to-accommodate claim is not dependent on causing harm to the employee through an adverse employment action.  While a lack of demonstrable consequences -- whether in the form of an adverse action, of injuries like those sustained by Richter, or of some other type -- might affect the damages to which an affected employee might be entitled, an employer's failure to accommodate is itself an actionable harm.  The Court declines to adopt the approach taken by some courts -- that the employer's failure to reasonably accommodate is "the" adverse employment action for purposes of considering the rights of a person with disabilities in the workplace.  Rather than impose a formalistic hurdle, the better, and simpler, course is to recognize that an adverse employment action is not an element of a failure-to-accommodate claim.  (pp. 25-29)

5.  The Court next turns to whether Richter's failure-to-accommodate claim is barred by the WCA's exclusive remedy provision.  The parties' positions pit against one another two statutory schemes -- the LAD and the WCA -- both of which are remedial in nature.  Enacted in 1911, the WCA was a historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment.  The WCA has an exclusivity requirement and a limited "intentional wrong" exception whereby, "[i]f an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same

employ as the person injured or killed, except for intentional wrong." N.J.S.A. 34:15-8. The LAD's worthy purpose is no less than eradication of the cancer of discrimination in our society, and the LAD is given liberal construction. This appeal focuses on the LAD's damages provision. In 1990, the Legislature amended the LAD to provide for a right to a jury trial and punitive damages. And N.J.S.A. 10:5-13 was amended to add common law remedies for an LAD statutory violation: "All remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any provided by this act or any other statute." Legislative history of the 1990 amendments makes clear that the Legislature's intent was to reinforce that the LAD supplements the common law. (pp. 29-38)

6. An overriding principle of statutory construction compels that every effort be made to harmonize legislative schemes enacted by the Legislature. The Court reviews cases in which it harmonized the LAD with other statutes when conflicts were perceived. The WCA was in place when the LAD was enacted, and the Legislature certainly would have been aware of the WCA when, in 1990, it added the common law remedies to the LAD and directed that the LAD supplement those remedies. In Schmidt v. Smith, the Appellate Division relied in part on those 1990 amendments in concluding that the WCA was not the exclusive means for managing sexual harassment in the workplace and that an LAD action could be pursued notwithstanding the WCA. 294 N.J. Super. 569, 585-86 (App. Div. 1996), aff'd, 155 N.J. 44 (1998). The Court now makes express Schmidt's import, holding that the WCA's exclusive remedy provision does not attach to Richter's LAD claim. Each statute operates to fulfill different purposes, both protective of workers in the workplace. The statutes can function cumulatively and complementarily; they are not in tension, much less in conflict, as the Court illustrates by reviewing the facts of the present case. The two statutory schemes, harmonized, operate to prevent double recovery. With double recovery averted, there is no possible conflict. Thus, the full-throated pursuit of remedies available under the LAD for actionable disability discrimination may proceed unencumbered by the WCA exclusivity bar. (pp. 39-47)

7. The WCA provides a workers' compensation lien for an employer under N.J.S.A. 34:15-40. The Appellate Division reviewed that provision's operation and instructed on how, if a jury awards damages to Richter on remand, the employer may obtain reimbursement for workers' compensation benefits paid. 459 N.J. Super. at 423-26. The Court reviews those instructions and agrees with the Appellate Division's direction on this matter, rejecting defendants' argument claiming a right to "100% reimbursement." The Court also affirms the Appellate Division's holding that the jury may not be presented with evidence of Richter's medical expenses and lost wages. (pp. 47-48)

**AFFIRMED AS MODIFIED. REMANDED for trial.**

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE LaVECCHIA's opinion.**

4

Mary Richter,

Plaintiff-Respondent,

v.

Oakland Board of Education,

Defendant-Appellant,

and

Gregg Desiderio, individually
and as Principal of the Valley Middle School,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
459 N.J. Super. 400 (App. Div. 2019).

| Argued | Decided |
|--------|---------|
| September 14, 2020 | June 8, 2021 |

Aileen F. Droughton argued the cause for appellants
Oakland Board of Education and Gregg Desiderio (Traub
Lieberman Straus & Shrewsberry, attorneys; Aileen F.
Droughton, on the briefs).

Betsy G. Ramos argued the cause for appellant Oakland
Board of Education (Capehart & Scatchard, attorneys;
Betsy G. Ramos, on the briefs).

Gerald Jay Resnick argued the cause for respondent (Resnick Law Group, attorneys; Gerald Jay Resnick on the briefs).

Andrew Dwyer argued the cause for amicus curiae National Employment Lawyers Association of New Jersey (The Dwyer Law Firm, attorneys; Andrew Dwyer, of counsel and on the briefs).

Benjamin Folkman argued the cause for amicus curiae New Jersey Association for Justice (Folkman Law Offices, attorneys; Benjamin Folkman, Eve R. Keller, Lauren M. Law, Sarah Slachetka, and Paul C. Jensen, Jr., on the briefs).

Renee Greenberg, Deputy Attorney General, submitted a brief on behalf of amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel, Mayur P. Saxena, Assistant Attorney General, on the brief, and Renee Greenberg and Latoya L. Barrett, Deputy Attorneys General, on the brief).

Edward G. Sponzilli submitted a brief on behalf of amicus curiae Rutgers, the State University of New Jersey (Norris McLaughlin, attorneys; Edward G. Sponzilli, of counsel and on the brief, and Annmarie Simeone, and Anthony P. D'Elia, on the brief).

Richard A. Friedman submitted a brief on behalf of amicus curiae New Jersey Education Association (Zazzali, Fagella, Nowak, Kleinbaum & Friedman; attorneys; Richard A. Friedman, of counsel and on the brief, and Craig A. Long, on the brief).

Christine P. O'Hearn submitted a brief on behalf of amicus curiae the New Jersey Municipal Excess Liability Fund (Brown & Connery, attorneys; Christine P. O'Hearn, and Kathleen E. Dohn, on the brief).

This appeal raises two compelling issues for resolution by this Court. Unfortunately, the case arises from a tragic event.

Plaintiff Mary Richter, a longtime diabetic and teacher, experienced a hypoglycemic event in a classroom, which she claims happened because her work schedule prevented her from eating her lunch early enough in the day to maintain proper blood sugar levels. She fainted, hit her head on a science laboratory table, and sustained serious and permanent life-altering injuries.

Although Richter recovered benefits under the Worker's Compensation Act (WCA), N.J.S.A. 34:15-1 to -146, she pursued through this action a claim under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, alleging that her employer failed to accommodate her pre-existing disability. According to Richter, in the months leading up to the incident, she repeatedly asked her school principal to change her schedule of teaching and cafeteria monitoring so she could manage her blood sugar levels by having her lunch earlier in the day, but he failed to accommodate her request.

The first issue we must address is whether Richter is required to establish an adverse employment action -- such as a demotion, termination, or other similarly recognized adverse employment action -- to be able to proceed

3

with an LAD failure-to-accommodate disability claim. According to defendants, an adverse employment action is a required element of a failure-to-accommodate claim and Richter's pleading is fatally deficient for not including that element. We now put to rest that contention and hold that an adverse employment action is not a required element for a failure-to-accommodate claim under the LAD.

The second issue raised by this appeal is whether plaintiff's claim is barred by the "exclusive remedy provision" of the WCA because she recovered workers' compensation benefits. According to defendants, to the extent Richter's LAD claim includes a demand for damages for bodily injuries or their equivalent, it is barred under N.J.S.A. 34:15-8 unless she proves that defendants engaged in an intentional wrong. For the reasons set forth herein, we conclude that plaintiff's LAD claim based on defendants' alleged failure to accommodate her pre-existing diabetic condition is not barred by the WCA, and we reject the further contention that plaintiff must filter her claim through the required showings of the "intentional wrong exception."

Accordingly, we affirm with modification the judgment of the Appellate Division, and we remand this matter for trial.

I.

A.

Because this appeal arises from a summary judgment record, we recite the facts in the light most favorable to the party opposing the motion for judgment, here plaintiff.  See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Richter was working as a science teacher, employed by the Oakland Board of Education (Board) and assigned to the Valley Middle School (VMS) at the time of the events that led to this action.  Some background on the structure of the school year and school day at VMS is necessary to understand Richter's claim that defendants failed to accommodate her disability due to her pre-existing condition as a type 1 diabetic.[1]

---

[1] "Type 1 diabetes, once known as juvenile diabetes or insulin-dependent diabetes, is a chronic condition in which the pancreas produces little or no insulin.  Insulin is a hormone needed to allow sugar (glucose) to enter cells to produce energy. . . .  Despite active research, type 1 diabetes has no cure.  Treatment focuses on managing blood sugar levels with insulin, diet and lifestyle to prevent complications."  Mayo Clinic, Type 1 diabetes, https://www.mayoclinic.org/diseases-conditions/type-1-diabetes/symptoms-causes/syc-20353011.  See also Stedman's Medical Dictionary 530 (28th ed. 2006) (defining Type 1 diabetes as "a condition characterized by high blood glucose levels caused by a total lack of insulin.  Occurs when the body's immune system attacks the insulin-producing beta cells in the pancreas and destroys them.  The pancreas then produces little or no insulin.  Type 1 diabetes develops most often in young people but can appear in adults.").  The record indicates that Richter developed diabetes as a juvenile.

VMS's school year is divided into four academic marking periods. Each school day is divided into eight time periods. Students are assigned to eat lunch during either the fifth or the sixth time periods, which together last from 11:31 a.m. to 1:02 p.m. During those lunch periods, certain teachers are assigned to cafeteria monitoring duty, where they are responsible for supervising the students eating lunch. Accordingly, depending on their overall schedule, some teachers assigned to lunch duty must wait to eat their own lunch until seventh period, which is from 1:05 to 1:49 p.m.

At the start of the 2012-2013 school year, Richter received her schedule for the first marking period and learned that on Wednesdays and Thursdays she was assigned to lunch duty during fifth period, followed by an instructional class during sixth period; accordingly, she would not eat her own lunch until seventh period. Believing that waiting until seventh period to eat lunch would negatively affect her blood sugar levels, Richter asked VMS's principal, Gregg Desiderio, on the first day of school to adjust her schedule so she could eat lunch during fifth period. Desiderio told Richter he would "look into it."

On September 10, 2012, Richter followed up with an email to Desiderio, asking if he was "able to figure out a way to flip [her] lunch and duty periods on Wednesday and Thursday." Richter explained in the email that she had "tried a couple different things" to keep her blood sugar regulated, but those

6

steps were of no avail. Desiderio did not respond to the email. Richter asserts that when she spoke again with Desiderio, he again stated that he would "look into it."

During one conversation with Richter, Desiderio told her that he did not believe he could "undo what he did" with the schedule; according to Desiderio, he also told Richter that if she was having trouble on a particular day, she could go to cafeteria duty late or skip it altogether. Richter denies that Desiderio ever said she could completely skip cafeteria duty, and it is undisputed that Desiderio never changed her schedule prior to the accident. For the remainder of the first marking period, Richter attended to her cafeteria duties and ingested glucose tablets to maintain her blood sugar levels.

For the second marking period, Richter's request for a fifth-period lunch was accommodated. But when the schedule for the third marking period issued, Richter was once again scheduled on Tuesdays for cafeteria duty during fifth period, an instructional class during sixth period, and her lunch during seventh period. Richter immediately approached Desiderio, who acknowledged that he had made a mistake when setting the third-marking-period schedule. Desiderio nonetheless declined to change the schedule, explaining that he needed three teachers on cafeteria duty each day. He told Richter that if she was not feeling well, she could sit down, have a snack, and

7

report to duty once she was feeling better. Richter asked for Desiderio's instructions to be put in writing. He did not do so, nor did he change the schedule or direct anyone in the school's main office to change the schedule.

Although a union representative told Richter that she would not be disciplined for skipping cafeteria duty, Richter continued to attend her assigned cafeteria duty during the third marking period, believing Desiderio's additional directions needed to be in writing or the schedule needed to be changed. Richter feared that if an emergency occurred in the cafeteria while she was scheduled for duty, but not present, she could be held liable. As a result, on Tuesdays, Richter's blood sugar levels often fell below the normal range by the close of sixth period, requiring her to ingest glucose tablets.

On March 5, 2013, near the end of one such sixth period, Richter suffered a hypoglycemic event in front of her students. She had a seizure, lost consciousness, and struck her head on a lab table and the floor, causing extensive bleeding. Richter was transported to a hospital for treatment. Prior to that, she had never passed out at work.

After the accident, in a text exchange with Desiderio, Richter again asked him to change her schedule. Desiderio responded that he previously told her not to attend fifth period cafeteria duty, but he agreed to cross her name off the schedule for cafeteria duty.

8

As a result of her fall, Richter suffered serious and permanent injuries, including:  total loss of smell; meaningful loss of taste; dental and facial trauma; tinnitus; insomnia; tingling in her fingers; extraction of her right front tooth, implantation of a dental bridge and bone grafts; altered speech; neck pain and radiation to her posterior shoulder; paranesthesia and dysesthesias; post-concussion syndrome; vertigo; dizziness; severe emotional distress; and decreased life expectancy.  She also lost sick days and incurred dental costs not covered by insurance.

Richter filed a workers' compensation claim for the work-related injuries.  The Board paid $18,940.94 for Richter's medical bills and $9,792.40 for temporary disability benefits.  Subsequently, she received $77,200 in partial total permanent disability benefits.

B.

On March 2, 2015, Richter filed this action rooted in LAD disability discrimination for failure to accommodate her diabetic condition against the Board and Desiderio, individually and in his capacity as principal.  Richter sought compensatory damages for her economic, physical, and emotional injuries, as well as punitive damages.

Defendants moved for partial summary judgment on the basis that Richter's bodily injury claim was barred by the exclusive remedy provision of

9

the WCA.  In an oral opinion, the motion judge held that under the WCA's intentional wrong exception, Richter's bodily injury claim was not barred.

Following that denial, defendants moved for summary judgment again, alleging that Richter failed to establish a prima facie failure-to-accommodate claim under the LAD because she suffered no adverse employment action. Richter filed a cross-motion for summary judgment arguing that she did suffer an adverse action and could establish a prima facie claim.  Defendants also re-filed a motion to dismiss Richter's bodily injury claim under the WCA, or in the alternative, to be entitled to a 100% credit for the WCA award already paid; defendants additionally sought to bar Richter's medical bills and lost wages from being presented at trial.

In a written opinion, a different motion judge granted defendants' motion for summary judgment and denied Richter's motion, determining that Richter did not suffer an adverse employment action because she was not fired or reassigned to another position and was thus unable to establish a prima facie failure-to-accommodate claim.

Addressing Richter's argument that she did not need to demonstrate an adverse employment action, the judge acknowledged that Victor v. State, 203 N.J. 383 (2010), suggested in dicta that an adverse employment action may not be a necessary element for an LAD failure-to-accommodate claim; the judge

10

nevertheless concluded that "an adverse employment action remains a required element of a prima facie failure to accommodate claim under the NJLAD."

After the court rejected their motions for reconsideration, both parties appealed.

C.

In a careful and comprehensive published decision authored by Judge Sumners, the Appellate Division reversed the grant of summary judgment to defendants and affirmed the denial of Richter's summary judgment motion, sending the matter back for trial. Richter v. Oakland Bd. of Educ., 459 N.J. Super. 400, 412-13, 419-20 (App. Div. 2019).

The court began with the arguments raised in Richter's appeal, addressing first whether a prima facie disability-accommodation claim under the LAD requires establishing an adverse employment action. See id. at 412-16.

The court pointed to the analysis in Victor that while an adverse employment action has generally been recognized as a required element for a disability-accommodation claim, the LAD's broad remedial purpose may "permit plaintiffs to proceed against employers who have failed to reasonably accommodate their disabilities or who have failed to engage in an interactive process even if they can point to no adverse employment consequence that

11

resulted." Id. at 414-15 (quoting Victor, 203 N.J. at 421). The court also noted that in Royster v. State Police, this Court articulated the elements required to establish a prima facie LAD failure-to-accommodate claim "without including the requirement that an adverse employment action must be proven." Richter, 459 N.J. Super. at 415-16 (citing 227 N.J. 482, 500 (2017)).

The Appellate Division's interpretation of Victor and Royster led it to conclude "that Richter's LAD claim for failure to accommodate her diabetes disability should not have been dismissed on summary judgment based on a lack of adverse employment action." Id. at 416. Even so, the court rejected Richter's contention "that defendants' refusal to accommodate an employee's disability constitutes an adverse employment action." Id. at 417. The court applied a standard for assessing an adverse employment action that examined whether defendant's actions "materially alter[ed] the terms and conditions of . . . employment" and concluded that Richter's claim did not meet it. Id. at 418.

Next, the court affirmed the denial of Richter's summary judgment motion. Id. at 419-20. The court recognized that it is undisputed that defendants knew about Richter's disability and that Richter requested accommodations, but it found that a reasonable jury could determine that "defendants participated in the interactive process and made a good faith effort

12

to provide [Richter] with an accommodation." Id. at 420. The court pointed to statements by Desiderio and others that "Richter was verbally told at the beginning of the third marking period -- prior to her fall on March 5, 2013 -- that she did not have to perform her fifth period cafeteria duty if she felt she needed to eat her lunch." Ibid. Although it found that summary judgment could not be entered in favor of Richter, the Appellate Division reinstated Richter's claim for punitive damages under the LAD. Ibid.

The Appellate Division then turned to defendants' cross-appeal and addressed whether Richter's bodily injury claim is barred by the WCA's exclusive remedy provision, and, if not, whether her employer "should receive 100% credit for the worker's compensation payments it made" in the event of a jury award in Richter's favor. Id. at 421.

The appellate court recognized that when an employee pursues remedies under the WCA, she generally "gives up the right to pursue common law claims for work-related injuries." Ibid. However, the court noted the intentional-wrong carve-out to the exclusivity bar and, applying that exception, reasoned that Richter's claim "is not barred by the [WCA's] exclusive remedy provision" because, when viewing the allegations in the light most favorable to Richter, "Desiderio intentionally refused her accommodation request, and it was substantially certain that she could suffer a hypoglycemic event." Id. at

13

423. Moreover, as explained by the court, "[t]his is not the 'simple fact of industrial life' envisioned by the [WCA]." Ibid. (quoting Laidlow v. Hariton Mach. Co., Inc., 170 N.J. 602, 623 (2002)). The court found additional support for its conclusion in Schmidt v. Smith, in which the Appellate Division recognized that "there is no language in the LAD that mandates that claims made by employees against employers under [the LAD] may only be brought" via the WCA. Richter, 459 N.J. Super. at 423 (quoting Schmidt, 294 N.J. Super. 569, 585 (App. Div. 1996), aff'd, 155 N.J. 44 (1998)). Accordingly, the Appellate Division reversed the grant of summary judgment to defendants and held that "Richter can present her bodily injury claims directly arising from her LAD claim to the jury." Ibid.

Finally, the Appellate Division rejected the argument that defendants must receive a 100% credit for the workers' compensation award paid to Richter. The court held that, under N.J.S.A. 34:15-40(b) (Section 40), the employer would be entitled only to a lien -- totaling only two-thirds the amount it paid in workers' compensation to Richter in medical payments and temporary benefits -- on the jury award, with the remaining one-third allocated to reimburse Richter's compensation counsel. Id. at 425-26.[2]

---

[2] The Appellate Division did not mention the partial total permanent disability amount paid in settlement to Richter in a final resolution of the compensation

14

We granted defendants' petition for certification limited to "whether an employee alleging discrimination for failure to accommodate a disability, pursuant to the [LAD], is required to show an adverse employment action; and whether plaintiff's claim is barred by the exclusive remedy provision of the [WCA]." 240 N.J. 58 (2019). We also granted motions by the New Jersey Association for Justice (NJAJ), the National Employment Lawyers Association of New Jersey (NELA), and the Attorney General to appear as amici curiae.

II.

The parties advance the following arguments with respect to whether a failure-to-accommodate claim requires the showing of an adverse employment action.

Defendants argue that the Appellate Division erred in concluding that a plaintiff can present a prima facie case for a failure to accommodate without showing an adverse employment action. They contend that the appellate court misapplied dicta in Victor and Royster. In support, defendants point to state and federal court decisions that, since Victor was decided in 2010, have continued to require an adverse employment action as an element for an LAD failure-to-accommodate claim.

claim. We are unaware from this record of the fees attributable to compensation counsel for those benefits and whether the settlement addressed them in any way; thus, we do not comment further on those benefits.

15

Richter, on the other hand, argues that the Appellate Division rightfully relied on Victor and Royster in holding that an adverse employment action is not a requirement for a failure-to-accommodate claim. She contends that the Appellate Division's approach is also consistent with several United States Courts of Appeals' decisions applying the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 to 12213.

Amici NJAJ, NELA, and the Attorney General all similarly argue that Richter need not allege a distinct adverse employment action in order to bring a failure-to-accommodate claim. NELA and the Attorney General both add that a failure to accommodate may itself constitute an adverse employment action.

## III.

We turn first to the necessary elements for a failure-to-accommodate claim brought by an individual claiming disability discrimination under the LAD.

## A.

"The LAD prohibits employment discrimination on the basis of a disability." Potente v. County of Hudson, 187 N.J. 103, 110 (2006) (citing N.J.S.A. 10:5-4.1, -29.1). Although the LAD does not explicitly address a reasonable accommodation requirement or claim, "our courts have uniformly

held that the [LAD] nevertheless requires an employer to reasonably accommodate an employee's" disability.  Royster, 227 N.J. at 499 (alteration in original) (quoting Potente, 187 N.J. at 110).  That requirement was codified in a regulation by the agency charged with administering the LAD and promulgating regulations for its implementation and enforcement.  See N.J.S.A. 10:5-8(g) (authorizing the adoption of regulations "to carry out the provisions of this act").

Under N.J.A.C. 13:13-2.5(b), "unless it would impose an undue hardship on the operation of the business," an employer must "make a 'reasonable accommodation to the limitations of an employee . . . who is a person with a disability.'"  Potente, 187 N.J. at 110 (omission in original) (quoting N.J.A.C. 13:13-2.5(b)).  The Division on Civil Rights' promulgation of N.J.A.C. 13:13-2.5(b) in 1985 marked the genesis of reasonable-accommodation claims under the LAD.  See Victor, 203 N.J. at 400-02.

Prior to our opinion in Victor, we had approvingly recognized failure to accommodate as a claim under the LAD and touched upon its contours.  See, e.g., Viscik v. Fowler Equip. Co., Inc., 173 N.J. 1, 19-20 (2002) (recognizing that a plaintiff can affirmatively plead "failure to reasonably accommodate as a separate cause of action" from a discriminatory discharge or disparate treatment claim); Potente, 187 N.J. at 110-12; Raspa v. Off. of Sheriff of

17

Gloucester, 191 N.J. 323, 337-40 (2007).  However, in none of those cases did we dwell on the necessary elements of a failure-to-accommodate claim.

Rather, the identification of elements developed in decisions issued by the trial courts and the Appellate Division.  See, e.g., Seiden v. Marina Assocs., 315 N.J. Super. 451, 465-66 (Law Div. 1998); Muller v. Exxon Rsch. & Eng'g Co., 345 N.J. Super. 595, 602-03 (App. Div. 2001); Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 91 (App. Div. 2001).  And, as we recognized in Victor, those "courts uniformly identif[ied] adverse employment consequence as one element of the prima facie case for disability discrimination."  203 N.J. at 413.  Our discussion in Victor, however, also noted that "[t]hose opinions [did] so . . . in part because they recite the familiar elements consistent with any employment discrimination case, and in part because the factual setting of each case included an adverse job consequence."  Ibid.

It was not until Victor that this Court confronted a dispute over the required elements of a failure-to-accommodate claim where a claimant does not allege an adverse employment action.  Id. at 412-13.  In that appeal, after reviewing the regulatory history of N.J.A.C. 13:13-2.5(b), relevant case law from this state, and federal court cases interpreting the ADA, we acknowledged the issue as unsettled and made the following observation:

18

The LAD's purposes suggest that we chart a course to permit plaintiffs to proceed against employers who have failed to reasonably accommodate their disabilities or who have failed to engage in an interactive process even if they can point to no adverse employment consequence that resulted. Such cases would be unusual, if not rare, for it will ordinarily be true that a disabled employee who has been unsuccessful in securing an accommodation will indeed suffer an adverse employment consequence.

That is, the disabled employee who is denied a requested reasonable accommodation necessary to perform the job's essential functions will generally, as a result, not be hired or promoted, or will be discharged. Indeed, it is difficult for us to envision factual circumstances in which the failure to accommodate will not yield an adverse consequence. But there may be individuals with disabilities who request reasonable accommodations, whose requests are not addressed or are denied, and who continue nonetheless to toil on.

Perhaps in those circumstances the employee could demonstrate that the failure to accommodate forced the employee to soldier on without a reasonable accommodation, making the circumstances so unbearable that it would constitute a hostile employment environment. But there also might be circumstances in which such an employee's proofs, while falling short of that standard, would cry out for a remedy. We cannot foresee all of the factual settings that might confront persons with disabilities and, although hard to envision, we therefore cannot entirely foreclose the possibility of circumstances that would give rise to a claim for failure to accommodate even without an identifiable adverse employment consequence.

[Victor, 203 N.J. at 421-22.]

Ultimately, the holding in <u>Victor</u> did not resolve whether an adverse employment action is a requisite part of a prima facie failure-to-accommodate claim because the plaintiff in that case was unable to establish the other indisputably required elements of the claim, and the Court's holding rested on those failures. <u>Id.</u> at 422-24. The observation in <u>Victor</u> that an adverse employment action may not be a necessary element remained dicta.

Seven years after <u>Victor</u>, this Court demarked the elements of a failure-to-accommodate claim under the LAD. We stated in <u>Royster</u> that

> [t]o establish a failure-to-accommodate claim under the LAD, a plaintiff must demonstrate that he or she (1) "qualifies as an individual with a disability, or [ ] is perceived as having a disability, as that has been defined by statute"; (2) "is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations"; and (3) that defendant "failed to reasonably accommodate [his or her] disabilities."
>
> [227 N.J. at 500 (alterations in original) (quoting <u>Victor</u>, 203 N.J. at 410).]

Clearly absent from that recitation is mention of an adverse employment action as an element. Two years later, in <u>Caraballo v. City of Jersey City Police Department</u>, we again recited the elements of a failure-to-accommodate claim without including adverse employment action as a requirement. 237 N.J. 255, 267-68 (2019). In neither case, however, did we expressly hold that an

20

adverse employment action is not an element of an LAD claim for failure to accommodate.

This appeal, with its pointed joining of issues on the question, presents the matter head-on and thus provides the vehicle for us to definitively determine whether a failure-to-accommodate claim under the LAD should require a plaintiff to show an adverse employment action in order to proceed with such a claim.

B.

As is often true, federal anti-discrimination cases provide a helpful "source of interpretive authority." Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97 (1990). It has proven advantageous to harmonize, to the extent possible, the LAD's development with Title VII's development, in the interest of "some reasonable degree of symmetry and uniformity." Id. at 107. That approach informs us also with respect to the ADA, notwithstanding some differences in statutory language. See, e.g., Viscik, 173 N.J. at 16, (comparing the scope of covered disability under federal and state law).

Victor searched for a consensus among federal courts as to the elements of a failure-to-accommodate claim, and since then even more federal decisions have touched on the elements question currently before us. In interpreting the ADA, many federal courts have recited the elements of such a claim without

21

mention of a required adverse employment action, as we did for claims under the LAD in Royster and Caraballo. See, e.g., Hill v. Assocs. for Renewal in Educ., 897 F.3d 232, 237 (D.C. Cir. 2018) (stating that, in a failure-to-accommodate claim, "a plaintiff must show . . . (1) that he or she has a disability under the ADA; (2) that the employer had notice of the disability; (3) that the plaintiff could perform the essential functions of the position . . . ; and (4) that the employer refused to make the accommodation"); Valle-Arce v. P.R. Ports Auth., 651 F.3d 190, 198 (1st Cir. 2011) (stating that, to make out a reasonable-accommodation claim under the ADA, the plaintiff had to show "(1) that she suffers from a disability . . . , (2) that she is an otherwise qualified individual . . . , and (3) that the [employer] knew of her disability and did not reasonably accommodate it"); Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (stating that, to establish a prima facie failure-to-accommodate claim, a plaintiff must show "(1) that he was an individual who had a disability . . . ; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations" (alterations in original) (quoting Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999)); Smith v. Ameritech, 129 F.3d 857, 866 (6th Cir. 1997) ("[P]laintiff must prove that (1)

22

he has a disability; (2) that he is 'otherwise qualified' for the job; and (3) that defendants either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability." (emphasis added) (citation omitted)).

Notably, the Third Circuit Court of Appeals has taken a different approach. Although the Third Circuit lists an adverse employment action as an element, it recognizes that "[a]dverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities." Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004), superseded in part by statute on other grounds, 42 U.S.C. § 12201(h). The Third Circuit "thus collaps[es] the two traditional proof elements into one." Victor, 203 N.J. at 416. It is not unique in that approach. See Dick v. Dickinson State Univ., 826 F.3d 1054, 1060 (8th Cir. 2016) (requiring an adverse action as an element but noting that "[a]n employer is also liable for committing an adverse employment action if the employee in need of assistance actually requested but was denied a reasonable accommodation").

Admittedly, in the above cases in which the plaintiff prevailed, an adverse employment action had occurred, just as was noted in Victor, so the lack of adverse employment action as an element in those cases could reflect

23

the courts' recognition that a clear adverse action was assumed. See Victor, 203 N.J. at 416 (commenting on Williams, 380 F.3d at 758). However, in at least two federal cases, a plaintiff's failure-to-accommodate claim was permitted to proceed when no adverse employment action occurred.

In a recent en banc opinion, the United States Court of Appeals for the Tenth Circuit affirmatively declared that "an adverse employment action is not a requisite element of a failure-to-accommodate claim." Exby-Stolley v. Bd. of Cnty. Comm'rs, 979 F.3d 784, 792 (10th Cir. 2020) (en banc). The court based its reasoning on its own failure-to-accommodate precedent, the precedent of no fewer than six circuits stating or strongly suggesting that there is no such requirement, the plain text of the ADA, and regulatory pronouncements of the Equal Employment Opportunity Commission (EEOC) responsible for administering the ADA, and it capped its conclusion with a compelling dose of common sense, stating that,

> because the ADA's reasonable-accommodation mandate focuses on "compelling behavior" rather than "policing an employer's actions," it would make little sense to require the showing of an adverse employment action as part of a failure-to-accommodate claim. In other words, it would verge on the illogical to require failure-to-accommodate plaintiffs to establish that their employer acted adversely toward them -- when the fundamental nature of the claim is that the employer failed to act.
>
> [Id. at 797 (citation omitted).]

24

See also <u>Garrison v. Dolgencorp, LLC</u>, 939 F.3d 937, 941 (8th Cir. 2019).[3]

C.

It is time to close debate on the elements of a failure-to-accommodate claim under the LAD. Our course was charted in <u>Victor</u>'s analysis. We now formally hold that an adverse employment action is not a required element for a failure-to-accommodate claim.

As <u>Victor</u> noted, two earlier cases implicitly suggested that an employee need not suffer an adverse employment consequence. 203 N.J. at 413-14 (discussing <u>Tynan v. Vicinage 13 of Superior Ct.</u>, 351 N.J. Super. 385, 400-01 (App. Div. 2002), and <u>Seiden</u>, 315 N.J. Super. at 459-61). <u>Victor</u> recognized that insistence on such a demonstration would ill serve the LAD's broad remedial purposes. 203 N.J. at 420-22. Further, such a requirement is not consistent with the obligation of employers to reasonably accommodate an

---

[3] In <u>Garrison</u>, the Eighth Circuit held that the plaintiff's ADA failure-to-accommodate claim could survive summary judgment despite no adverse employment action having occurred. 939 F.3d at 942. Because, as noted earlier, the Eighth Circuit had generally required an adverse employment action in cases prior to <u>Garrison</u> but had viewed the alleged failure to accommodate itself to satisfy the adverse-employment-action requirement, <u>see</u> <u>Dick</u>, 826 F.3d at 1060, that latest decision led the Tenth Circuit to comment: "if <u>Garrison</u> is a bellwether of the Eighth Circuit's developing jurisprudence in the ADA failure-to-accommodate context, that circuit may be erasing the thin line that typically has separated its precedent -- albeit only nominally -- from those circuits that have straightforwardly declined to incorporate an adverse-employment-action requirement." <u>Exby-Stolley</u>, 979 F.3d at 807 n.14.

25

employee with a disability.  N.J.A.C. 13:13-2.5(b) ("An employer must make a reasonable accommodation to the limitations of an employee . . . who is a person with a disability, unless the employer can demonstrate . . . undue hardship . . . .").

The overriding purpose of the LAD's promise to eradicate obstacles in the workplace for persons with disabilities is to make it possible for people to work.  Given that employers have an affirmative obligation to make reasonable accommodation, why should people who have requested but not received a reasonable accommodation from an employer have to wait for an adverse employment action to follow the employer's denial or inaction -- or refusal to even engage in an interactive dialogue about the request -- in order to bring a complaint to compel the employer to fulfill its affirmative obligation under the regulatory scheme?  To pose the question is to answer it.

The breach of the duty can, and should, be addressable before an adverse employment consequence occurs.  The wrongful act for purposes of a failure-to-accommodate claim is the employer's failure to perform its duty, not a further adverse employment action that the employee must suffer.  The persevering employee trying to make do without a reasonable accommodation is not remediless, and a callous employer may not escape LAD liability for failing to perform its required duty to provide accommodation simply by

26

declining to fire, demote, or take another form of adverse action against the employee. Such an approach would essentially render the reasonable accommodation requirement unenforceable in its own right and would run roughshod over the Legislature's stated intent to eradicate discrimination and make the workplace hospitable for persons with disabilities.

To best implement that legislative intent, we conclude that an employer's inaction, silence, or inadequate response to a reasonable accommodation request is an omission that can give rise to a cause of action. Cf. Exby-Stolley, 979 F.3d at 797 (finding similarly for an ADA cause of action). Stated otherwise, a failure-to-accommodate claim is not dependent on causing harm to the employee through an adverse employment action. And, certainly, the employer of an employee who suffers consequences from the employer's failure to accommodate should not escape LAD liability merely because those consequences do not fit neatly into a definition of adverse employment action. Indeed, while a lack of demonstrable consequences -- whether in the form of an adverse action, of injuries like those sustained by Richter, or of some other type -- might affect the damages to which an affected employee might be entitled, an employer's failure to accommodate is itself an actionable harm.

27

We recognize, as did the Appellate Division here, that some courts view the employer's failure to reasonably accommodate as "the" adverse employment action for purposes of considering the rights of a person with disabilities in the workplace. In that respect, those courts incorporate an adverse-employment-action requirement "in a manner that is essentially form, rather than substance" -- the analysis under that view results in the same outcome for the plaintiff's ability to proceed with the claim as when the element is not required at all. Id. at 806.

We see no need to add additional formalistic hurdles to a failure-to-accommodate claim. Indeed, given that providing a reasonable accommodation is an employer's obligation, see N.J.A.C. 13:13- 2.5(b), it makes little sense to include the adverse-employment-action element, even in form. The better, and simpler, course is to recognize that an adverse employment action is not an element of a failure-to-accommodate claim.

Accordingly, we hold that a failure-to-accommodate claim under the LAD does not require a plaintiff to plead and demonstrate an adverse employment consequence as an element of a prima facie action. The Appellate Division was correct to follow the lead of Victor, Royster, and Caraballo in concluding that Richter's pleading was not deficient for not including an

28

adverse-employment-action element and in denying defendants judgment on that basis.

## IV.

## A.

We turn now to whether Richter's failure-to-accommodate claim regarding her pre-existing diabetes is barred by the WCA's exclusive remedy provision. On this issue, the parties' arguments were supplemented after oral argument when we requested additional briefing from the parties and amici on two issues:

> 1. Are Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, claims filed by an employee against an employer for workplace bodily injuries subject to the exclusive remedy provisions of the Workers Compensation Act (WCA), N.J.S.A. 34:15-8?
>
> 2. Must an employee seeking recovery for bodily injuries under LAD prove that the employer engaged in an intentional wrong pursuant to N.J.S.A. 34:15-8?

We also granted the motions of Rutgers University, the New Jersey Municipal Excess Liability Fund (MELF), and the New Jersey Teachers Association (NJTA) to submit amicus curiae briefs.

B.

1.

According to defendants, Richter elected to pursue a compensation award and would receive a windfall if she could now also pursue an LAD claim for those same bodily injuries unless she can meet the WCA's intentional wrong exception. Defendants assert that exception cannot be met here because Desiderio offered an accommodation to Richter and she had never previously passed out at school; they maintain that defendants' actions therefore do not rise to the level of egregious and affirmative acts necessary for the intentional wrong exception to apply.

Responding to our questions, and emphasizing the WCA's function as a "social compact" and an "historic tradeoff," defendants assert that statutory LAD claims are subject to the WCA's exclusive remedy provision. Although acknowledging that the LAD makes "[a]ll remedies in common law tort actions" available, that LAD provision does not, in defendants' view, reflect a legislative intent to amend or supersede the WCA. Defendants stress that the WCA's exclusivity bar applies only to Richter's bodily injury claim and does not bar non-bodily injury LAD claims for emotional and economic harm.

Finally, defendants argue that the Appellate Division erred in its application of N.J.S.A. 34:15-40(b). They contend that if Richter's failure-to-

30

accommodate claim under the LAD can proceed and is successful, defendants should receive a 100% credit for compensation payments made to her.

2.

Richter asserts that discrimination is a statutory violation and not within the parameters of the WCA. In response to our questions, she argues that, given the LAD's plain language and broad remedial purposes to compensate victims of discrimination and disincentivize discrimination, her bodily injury claim based on the Board's failure to accommodate is not subject to the WCA's exclusive remedy provision, nor need it satisfy the intentional wrong exception. She maintains that nothing in the WCA suggests it was intended to bar claims to compensate victims of discrimination.

In the event that the intentional wrong exception has to be satisfied for her claim to proceed, Richter claims there is sufficient evidence that could lead a jury to conclude that Desiderio's actions fell within the intentional wrong exception. She also urges adoption of the Appellate Division's interpretation of the proper application of N.J.S.A. 34:15-40(b) in these circumstances.

3.

As for the original amici, NJAJ initially urged affirmance of the Appellate Division judgment on the basis that Richter's claim falls within the

intentional wrong exception of the WCA. Its expanded briefing is in substantial accord with arguments advanced by NELA.

From the outset, NELA has argued that a claim for damages under the LAD is not subject to the WCA's exclusive remedy provision, regardless of whether the claim fits within the intentional wrong exception. NELA asserts that requiring that an LAD plaintiff satisfy the intentional wrong exception under the WCA creates conflict with our holdings that both intentional and unintentional discrimination violate the LAD.

Elaborating in response to our questions, NELA points to the LAD's broad remedial purpose and language in the LAD that explicitly makes all remedies in common law tort actions available to a prevailing plaintiff, in addition to any other remedy provided under the LAD itself. Claiming support for its position from the legislative history surrounding the 1990 amendment to the LAD that allows plaintiffs to obtain all damages normally available in common law tort actions for physical injury and illness caused by unlawful discrimination, NELA argues that subjecting those damages claims to the WCA's exclusivity bar and requiring them to be filtered through the intentional wrong exception would negate the 1990 amendments and contravene the LAD's plain language. NELA urges us to harmonize the LAD and the WCA.

NJTA is also in substantial accord with NELA that the WCA should not impede the LAD's implementation of the right to be free from discrimination. NJTA asserts that, in any event, an LAD violation is sufficiently reprehensible to constitute an intentional wrong.

4.

Entering the appeal when we requested supplemental briefing, and supporting defendants' position, Rutgers argues that Richter's LAD bodily injury claim is subject to the WCA and barred unless it fits into the WCA's sole exception. Rutgers submits that a contrary conclusion would undermine the legislative intent of the WCA, cause unpredictability for employers, and create an unfairness among employees who sustain similar injuries under different circumstances.

MELF adds that holding LAD claims exempt from the WCA's exclusive remedy provision would lead to increased litigation and implicate complicated insurance issues.

V.

The parties' positions pit against one another two statutory schemes, both of which are remedial in nature. We turn to the two statutory programs involved.

## A.

The background to the WCA is ground well-covered in many previous decisions, but it bears repeating that "[t]he stimulus for workers' compensation legislation arose out of an increasing number of industrial accidents and the inadequacies of the common-law tort remedies that were available to aid injured workers." Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 174 (1985). Enacted in 1911 in response to those inequities, the New Jersey Workers' Compensation Act amounted to "a historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment." Ibid. Accordingly, the WCA provides that, "[w]hen employer and employee shall . . . accept the provisions of" the WCA by agreement, whether express or implied, then "compensation for personal injuries to, or for the death of, such employee by accident arising out of and in the course of employment shall be made by the employer without regard to the negligence of the employer, according to the schedule [codified by the WCA]." N.J.S.A. 34:15-7.

The WCA further states:

> Such agreement shall be a surrender by the parties thereto of their rights to any other method, form or

34

amount of compensation or determination thereof than as provided in this article and an acceptance of all the provisions of this article . . . .

If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

[N.J.S.A. 34:15-8.]

In the century since the enactment of the WCA, we have had numerous occasions to interpret the WCA's exclusivity requirement and, more specifically, its limited "intentional wrong" exception. See, e.g., Millison, 101 N.J. at 177-84; Laidlow, 170 N.J. at 617; Tomeo v. Thomas Whitesell Constr. Co., Inc., 176 N.J. 366, 372-78 (2003); Mull v. Zeta Consumer Prods., 176 N.J. 385, 390-93 (2003); Crippen v. Cent. Jersey Concrete Pipe Co., 176 N.J. 397, 406-11 (2003). In those encounters with the WCA, this Court developed and then refined a two-prong test for determining whether a claim outside of the WCA schedule met the intentional wrong exception:

(1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

[Laidlow, 170 N.J. at 617.]

35

In each of those cases, however, the injured employee brought common law claims against their employer, as opposed to statutory claims. This case pits a statutory claim against the WCA exclusivity bar.

B.

Richter asserts an LAD statutory claim, faulting defendants for failure to accommodate her pre-existing diabetic disability with a schedule alteration and claiming the range of damages available under the LAD.

The LAD has a rich history of broad application by this Court. As we have noted, "[o]ne searches in vain to find another New Jersey enactment having an equivalently powerful legislative statement of purpose, along with operative provisions that arm individuals and entities with formidable tools to combat discrimination not only through their use but also by the threat of their use." Rodriguez v. Raymours Furniture Co., Inc., 225 N.J. 343, 347 (2016). The LAD's worthy purpose is no less than eradication of "'the cancer of discrimination' in our society." Smith v. Millville Rescue Squad, 225 N.J. 373, 390 (2016) (quoting Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 108 (2010)). Accordingly, the LAD is given liberal construction, for the "more broadly [the LAD] is applied, the greater its antidiscriminatory impact." Ibid. (alteration in original) (quoting Nini, 202 N.J. at 115).

36

In particular, this appeal focuses attention on the LAD's damages provision. In 1990, the Legislature amended the LAD in response to the decision in Shaner v. Horizon Bancorp, 116 N.J. 433 (1989). L. 1990, c. 12. The amendments to the LAD included providing for a right to a jury trial and adding a provision for punitive damages. L. 1990, c. 12, §§ 1, 2. Importantly for present purposes, N.J.S.A. 10:5-13 was amended to add common law remedies for an LAD statutory violation:

> All remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any provided by this act or any other statute.
>
> [L. 1990, c. 12, § 2.]

The legislative purpose for making available remedies under the common law was explained in a separate addition to the findings and declarations provision of the LAD:

> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act. Such

harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.

[L. 1990, c. 12, § 1, amending N.J.S.A. 10:5-3.]

Legislative history of the 1990 amendments makes clear that the Legislature's intent was to reinforce that the LAD supplements the common law, and that, after Shaner, the Legislature felt the need to clarify that common law remedies were available to employees who were victims of unlawful discrimination. A. Judiciary, Law & Pub. Safety Comm. Statement to A. 2872 (Jan. 22, 1990). The amendments were described as "provid[ing] special protection to persons who are victimized because of membership in a protected class." Ibid.

According to defendants, the WCA's exclusive remedy provision trumps plaintiff's LAD failure-to-accommodate claim because reference to "common law remedies" could not have meant to include damages that would permit overlapping relief under the WCA and the LAD. The WCA prevails, according to defendants, and excludes any relief under an LAD claim for bodily injury, while permitting compensatory and punitive damages claims to proceed for LAD violations.

VI.

This is not the first appeal in which the Court is asked to give precedence to one statutory scheme over another. But our duty in such circumstances is clear: to follow the will and intent of the Legislature, which put both schemes in place. An overriding principle of statutory construction compels that every effort be made to harmonize legislative schemes enacted by the Legislature. Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14 (2005) ("When interpreting different statutory provisions, we are obligated to make every effort to harmonize them, even if they are in apparent conflict." (quoting In re Gray-Sadler, 164 N.J. 468, 485 (2000))).

A.

We have, in the past, harmonized the LAD with other statutes when conflicts were perceived. In Fuchilla v. Layman, we had to reconcile the demands of the notice provision of the Tort Claims Act (TCA), N.J.S.A. 59:8-8, with an LAD claim; we concluded that the TCA notice did not apply to LAD actions. 109 N.J. 319, 330-32 (1988). That holding was based, in part, on the different purposes of the two statutes. We explained that "[e]mployment discrimination is not just a matter between employer and employee. The public interest in a discrimination-free work place infuses the inquiry." Id. at 335. We then noted, "In contrast to the sweep of the [LAD],

39

the [TCA] seeks to provide compensation to tort victims without unduly disrupting governmental functions and without imposing excessive financial burden on the taxpaying public."  Ibid.  Hence, we held that "[t]he difference between the substantive standard for negligence, which was clearly a legislative concern in the [TCA], and the [LAD's] implicit emphasis on motive or intent suggests that the Legislature did not intend that the [TCA] apply to discrimination claims under the [LAD]."  Ibid.

Similarly, in Cavouti v. New Jersey Transit Corp., we were faced with the question of whether an LAD plaintiff could recover punitive damages against a public entity, despite the TCA's provision prohibiting punitive damages.  161 N.J. 107, 132 (1999).  There we held that

> a sensible and unconstrained reading of the language of the LAD, a consideration of the provisions of the LAD in light of the TCA, a review of the LAD's legislative history, an understanding of the underlying policy concerns in awarding punitive damages and an examination of LAD's remedial purposes persuade us that the LAD allows the award of punitive damages against public entities.
>
> [Id. at 133.]

And other settings illustrate still further our efforts to reconcile statutory schemes rather than interpret one as superseding another with respect to

40

enforcement of remedies provided by the Legislature for specific wrongs intended to be deterred.

For example, in Sun Chemical Corp. v. Fike Corp., we interpreted language similar to the language before us now in considering the interaction of another remedial statute, the Consumer Fraud Act (CFA), with the Product Liability Act (PLA). 243 N.J. 319 (2020). Here, the LAD declares that "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs . . . [and] [t]hese remedies are in addition to any other provided by [the LAD] or any other statute," N.J.S.A. 10:5-13(a)(2)(b) (emphasis added), and the Legislature expressly instructs that the LAD "be liberally construed in combination with other protections available under the laws of this State." N.J.S.A. 10:5-3. In Sun Chemical, we read similar language in the CFA to favor broad remedies for potential plaintiffs, and we concluded that the PLA does not preempt "a claimant from seeking relief under the CFA for deceptive, fraudulent, misleading, and other unconscionable commercial practices in the sale of the product. Indeed, the CFA is expressly 'in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State.'" 243 N.J. at 337 (emphasis added) (quoting N.J.S.A. 56:8-2.13).

41

B.

We reach the same conclusion with respect to the LAD and the WCA that we reached in Sun Chemical with respect to the CFA and the PLA.

The WCA was in place when the LAD was enacted, and the Legislature stated its clear intent that the LAD should be treated as supplemental to other remedies. N.J.S.A. 10:5-13(a)(2)(b). The Legislature certainly would have been aware of the WCA when it included such strong direction and when it added the common law remedies to the LAD in 1990.

In Schmidt, the Appellate Division, which we affirmed, relied in part on those 1990 amendments in concluding that the WCA was not the exclusive means for managing sexual harassment in the workplace and that an LAD action could be pursued notwithstanding the WCA. 294 N.J. Super. at 585-86, aff'd, 155 N.J. at 51. In that case, the Appellate Division dealt with whether an insurance provider was required to cover an employer for a hostile work environment and sexual harassment claim brought against a company and its president by an employee. 294 N.J. Super at 574. The employee did not seek worker's compensation, but rather brought an LAD claim. Ibid.

In attempting to disclaim coverage, the insurance company argued that "because of the exclusivity provision of the [WCA], plaintiff had to allege an intentional wrong on the part of [the employer] in order to bring her civil suit."

42

Id. at 584. Because that defense was advanced, the Appellate Division considered "whether sexual harassment claims under LAD are exclusively remediable under the [WCA] where the employer's conduct is not intentional." Ibid. After determining that "there is no language in the LAD that mandates that claims made by employees against employers under it may only be brought under the [WCA,]" and that the Legislature intended for the LAD to be "broadly applied and liberally construed," the Appellate Division held that the Legislature did not intend the WCA to serve as a worker's sole and exclusive remedy for victims alleging harassment and discrimination under the LAD. Id. at 585-86 (highlighting N.J.S.A. 10:5-3). We affirmed the Appellate Division in that coverage dispute, noting our agreement "that workers' compensation is not the exclusive remedy for victims of sexual harassment" under the LAD. Schmidt, 155 N.J. at 51.

Although the binding nature of Schmidt's pronouncement is disputed in this matter, we now have the opportunity to make express Schmidt's import. We hold that the WCA's exclusive remedy provision does not attach to Richter's LAD claim. The LAD's common law remedies made available through the 1990 amendments do not, in this instance, pose a conflict with the WCA. Each statute operates to fulfill different purposes, both protective of

43

workers in the workplace. The statutes can function cumulatively and complementarily; they are not in tension, much less in conflict.

C.

The facts of the present case clearly illustrate not only how the two statutory schemes can operate harmoniously, but why it is important that they do.

Richter's pursuit of her disability discrimination claim formulated as a failure to accommodate her pre-existing disability -- diabetes -- is not at cross purposes with the WCA's prompt and sure remedies for medical expenses and "personal injury," N.J.S.A. 34:15-1, in accordance with the schedule of benefits provided through workers' compensation. Those benefits provide salutary relief for workplace personal injuries, albeit it as a trade-off in that prompt payment pursuant to the workers' compensation schedule of payments, see N.J.S.A. 34:15-12, may result in a lesser WCA award than what might be available had a tort action been allowed, see Millison, 101 N.J. at 174 (stating that under the WCA, injured employees "relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits").

Richter's LAD claim is also not duplicative of the type of claim whose redress is secured through the WCA and therefore should not be regarded as

44

subordinate to the WCA's exclusive remedy feature.  The LAD provides relief

under state statutes for a different workplace wrong.[4]

---

[4]  Our recognition of the difference in purposes between the WCA and our LAD brings our approach into alignment with federal anti-discrimination law. It is understood that state workers' compensation exclusivity provisions do not bar claims brought under federal civil rights laws.  See 9 Larson's Workers' Compensation Law § 100.03[1] ("Federal antidiscrimination laws such as Title VII will trump a state workers' compensation statute, based on the Supremacy Clause which dictates that a state law not 'stand as an obstacle' to Congress' intent, in this case that of rooting out discrimination in the workplace."). EEOC guidance reflects the same.  In a regulatory guidance document, the EEOC explained:

> The purpose of workers' compensation exclusivity clauses is to protect employers from being sued under common law theories of personal injury for occupational injury.  Courts have generally held that the exclusive remedy provisions of state workers' compensation laws cannot bar claims arising under federal civil rights laws, even where a state workers' compensation law provides some relief for disability discrimination.  Applying a state workers' compensation law's exclusivity provision to bar an individual's ADA claim would violate the Supremacy Clause of the U.S. Constitution and seriously diminish the civil rights protection Congress granted to persons with disabilities.
>
> [EEOC Enforcement Guidance:  Workers' Compensation and the ADA (Sept. 3, 1996).]

Although the Supremacy Clause is not applicable here, we have long held that "our LAD's broad remedial purposes and the wide scope of its coverage for disabilities as compared to the ADA support an expansive view of protecting rights of persons with disabilities in the workplace."  Victor, 203 N.J. at 420-21.  Were we to hold that LAD claims were barred by the exclusivity bar of the WCA, then it would have the peculiar effect of rendering the LAD less protective than the ADA in this context.  We decline to tack our jurisprudence in that direction, which departs from our precedent.

Richter's disability is due to her pre-existing type 1 diabetes, clearly a disabling characteristic meant to be protected by the LAD's disability discrimination prohibitions. See N.J.S.A. 10:5-5(q) (defining "Disability" as a "physical or sensory disability . . . which is caused by . . . illness"). Disability discrimination under the LAD encompasses an employer's failure to comply with the duty to provide reasonable accommodation of the disability unless it causes undue hardship. N.J.A.C. 13:13-2.5(b). That duty includes the obligation to engage in an interactive effort to attempt to reach a reasonable accommodation. Ibid. Whether that happened here is a matter that the LAD says is to be determined through a jury trial. N.J.S.A. 10:5-13. Richter has a state law right to proceed with that claim.

The LAD allows the disability-discrimination claimant common law remedies, see N.J.S.A. 10:5-3, -13, that include, as Richter's complaint explicitly seeks, damages for economic loss and "for emotional and physical injury and distress." We hold that Richter must be permitted to pursue before a jury her LAD claims and remedies, as the LAD promises. Even defendants recognize Richter's right to proceed but would rewrite the LAD in these circumstances to proscribe certain remedies that the LAD permits. That proposed revision, however, would ill accord with the statute's remedial

purpose and principles of statutory construction requiring that legislative acts be interpreted, if possible, to operate in harmony rather than in conflict.

In sum, the two legislative acts provide relief for separate wrongs and can co-exist in harmony, with the purposes of each fulfilled. Indeed, the two statutory schemes, harmonized, operate to prevent double recovery. With double recovery averted, there is no possible conflict. Thus, the full-throated pursuit of remedies available under the LAD for actionable disability discrimination may proceed unencumbered by the WCA exclusivity bar.

## VII.

The WCA provides a workers' compensation lien for an employer through operation of Section 40, N.J.S.A. 34:15-40. The Appellate Division reviewed that provision's operation and instructed on how, if a jury awards damages to Richter in a remand at trial of this matter, the employer may obtain reimbursement for workers' compensation benefits paid to her. Richter, 459 N.J. Super. at 423-26. Those directions provided that, should the jury's award be equivalent to or exceed the amount paid to Richter for her medical benefits and temporary disability benefits ($28,733.84), a lien for her employer would attach; however, the jury may not include in that amount fees and costs paid to plaintiff's compensation attorney. Id. at 425-26. Without detailing that amount specifically, the Appellate Division noted that, by statute, the

47

compensation attorney's fees (and costs not to exceed $750) could not exceed one third of the WCA award, and the court directed that those amounts not be included in the employer's lien. Ibid.

We agree with the Appellate Division's direction on this matter and reject defendants' argument claiming a right to "100% reimbursement." The theory behind prevention of a double recovery through a lien under Section 40 is to bar Richter's receipt of duplicate damages. See id. at 424 (citing Millison, 101 N.J. at 187 and Calalpa v. Dae Ryung Co., Inc., 357 N.J. Super. 220, 227-29 (App. Div. 2003)). That does not mean that her employer is entitled to be reimbursed for fees plaintiff had to pay to counsel out of her compensation award. See 459 N.J. Super. at 425-26 (quoting Section 40).

The Appellate Division properly directed the trial court on how Section 40 should operate, in the event of a jury award for Richter's LAD failure-to-accommodate discrimination claim in an amount that prompts application of a Section 40 lien. The Appellate Division also properly held that the jury may not be presented with evidence of Richter's medical expenses and lost wages. We affirm both rulings. And, as did the Appellate Division, we leave application of these matters to the trial court for its sound handling.

## VIII.

The judgment of the Appellate Division is affirmed as modified and the matter is remanded to the trial court for trial.


CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE LaVECCHIA's opinion.